Theran Tremayne BLACKWELL,
Appellant,

v.

The STATE of Texas, Appellee.

No. 01–03–01314–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 31, 2006.

Discretionary Review Refused
June 7, 2006.

James M. Leitner, Houston, for Appellant.

Kevin P. Keating, Asst. Dist. Atty., Charles A. Rosenthal, Jr., Dist. Atty.–Harris County, Houston, for Appellee.

Panel consists of Justices NUCHIA, JENNINGS, and ALCALA.

## OPINION

ELSA ALCALA, Justice.

Appellant, Theran Tremayne Blackwell, pleaded not guilty to the offense of indecency with a child. TEX. PEN.CODE ANN. § 21.11(a)(1) (Vernon 2003). The jury found appellant guilty, found true an enhancement paragraph that alleged that appellant had a prior felony conviction, and assessed his punishment at confinement for 30 years. In two points of error, appellant contends that the trial court erred by admitting evidence of two extraneous offenses and by permitting the State to ask an improper commitment question in voir dire. Appellant's third point of error asserts that his trial attorney rendered ineffective assistance of counsel. We hold that the trial court did not err by allowing the admission of extraneous offenses as rebuttal evidence of appellant's defensive theories at trial, which suggested that appellant lacked the intent to sexually assault J.H. and that appellant was the victim of a "frame-up" by J.H.'s grandmother. We further hold that the State's voir dire questions were not improper commitment questions and that appellant's trial attorney did not render ineffective assistance of counsel at trial. We therefore affirm.

## Facts

Appellant was related to J.H.'s cousins and had known J.H. since he was very young. When J.H. was eight or nine years old, he began to visit appellant's residence alone and to spend the night there. J.H. lived with his grandmother, Melvina Stepherson, and made these visits with her permission. J.H. wanted to visit appellant's residence because his cousins Glen and Fred Stepherson often went there to watch movies and to play.

One night, while sharing a bed together in appellant's residence, appellant woke J.H. up to tell him that he had wet the bed and needed to change his clothes. After J.H. changed his clothes and returned to bed, appellant told him to disrobe, but J.H. refused. Appellant threatened to whip J.H. if he did not take his clothes off and then "whipped" J.H. when he refused to remove his clothes. J.H. finally complied by disrobing, and appellant told him to get baby oil from the bathroom. J.H. complied and returned to bed to find appellant naked. Appellant instructed J.H. to rub

baby oil on appellant's chest, his "private part," and his "behind." Appellant also rubbed J.H.'s "private part" and "behind" with baby oil. After the sexual contact, appellant told J.H. not to tell anyone what had transpired. J.H. testified that this conduct occurred repeatedly at appellant's apartment over the course of several years.

J.H. also described repeated sexual conduct with appellant that occurred in appellant's car. J.H. said that appellant gave him alcoholic beverages that caused him to feel drowsy and dizzy. At appellant's instruction, J.H. disrobed and rubbed appellant's "private part" while appellant rubbed J.H.'s "private part" with one hand. Appellant's other hand was on the steering wheel as he drove the car.

J.H. also described repeated sexual conduct that occurred with appellant at appellant's recording studio in a room that had what appeared to be cotton on the walls. Appellant told J.H. to remove his clothes, and, when J.H. complied, appellant pulled down his own pants and instructed J.H. to rub appellant's "private part."

When he was eight or nine years old, J.H. reported the sexual misconduct to his grandmother, Melvina Stepherson, but she did nothing about it because she was in poor health. J.H.'s mother, however, reported the conduct to police officers when she learned about J.H.'s allegations upon her release from prison.

At trial, the State's case-in-chief consisted of testimony from J.H., who was 13 years old at the time of the trial, his grandmother Melvina, and two police officers who testified about their investigation of the case. J.H.'s testimony at trial described the sexual contact with appellant that occurred over the course of several years. In anticipation of a challenge to J.H.'s credibility by the defense, the State introduced evidence of J.H.'s prior incon-sistent statements that were made to various people, on audiotape and in writing, in which J.H. claimed that the allegations that he had made against appellant were not true and that he was falsifying the allegations because he was jealous of the attention that appellant gave to his cousins Glen and Fred. J.H. explained during his direct examination by the State that his statements denying the conduct by appellant were not made voluntarily. Appellant's attorney cross-examined J.H. about his prior inconsistent statements and motives to lie about appellant.

Melvina testified during direct examination that she was unaware that appellant had ever had a girlfriend, that she believed J.H. when he initially reported the sexual misconduct to her, and that J.H. was a "good boy" who got into nothing more than normal boyhood trouble. Melvina also stated that appellant had purchased a pair of sneakers for J.H., but she "didn't think anything of it" because appellant "always bought things" for her "two grandsons." She did not give any other details about appellant's relationship with her "two grandsons." Likewise, she did not state, at that point in the trial, the names of her two grandsons, or whether they were children or adults. During cross-examination of Melvina, appellant's attorney introduced through her that appellant was a good father figure to her other two grandsons and that appellant had begun a football team for young boys.

Appellant's trial attorney presented the testimony of seven witnesses during appellant's case-in-chief. The testimony presented during appellant's defense at trial showed the following: (1) J.H. stated in writing and on audiotape that appellant was not improper with J.H. in any way; (2) J.H. is not a truthful person; (3) J.H. falsified the allegations because J.H. believed that appellant was mean and be-

cause J.H. was jealous of the attention that appellant gave to J.H.'s cousins, and (4) appellant had previously had many girlfriends. Appellant's attorney also introduced testimony from a district court clerk who said that her records showed that appellant was in jail on the date of the offense alleged in the indictment.

In rebuttal, over appellant's objections, the State introduced two extraneous offenses of sexual misconduct by appellant against two young boys, K.S. and C.R. K.S. testified that, when he was 13 years old, he was in a music group with two other boys who were 13 and 15 years of age. The three boys looked in the yellow pages for a recording studio, called the studio, and ultimately went to the studio where they met appellant. The boys visited the studio seven times in an attempt to record a song, and each time they visited, other people were in the studio recording songs. Appellant never asked the boys for money to record at his studio. During the seventh visit to the studio, the three boys accompanied appellant to a windowless, soundproof room that had what looked like cotton on the walls, where the group practiced singing a song. Appellant then said that he wanted to hear each of the boys individually. When K.S. was alone with appellant in the soundproof room, appellant told him that he had to sing louder. Appellant told him that if he "jacked off or bust a nut" it would make him sing louder. K.S. said, "No." Appellant then suggested that K.S. take off his shoes, which K.S. did. Appellant told K.S. to sing the verse again, and appellant again told K.S. that he was not satisfied with the singing. Appellant then told K.S. to take off his shirt. K.S. initially refused, but then took his shirt off because he believed that he might then be allowed to leave. At appellant's instruction, K.S. again sang the song, which appellant said was a bit better. Appellant, however, continued to request that K.S.

disrobe. Appellant told K.S. to take off his pants, and K.S. complied. K.S. explained that, because appellant was standing right by the locked door, he did not feel that he could leave. When appellant told K.S. to take his boxer shorts off, K.S. felt that he might cry because he feared what appellant wanted from him. Before K.S. took the boxer shorts off, appellant told him to come over to him. Appellant then put his arm around K.S. and started rubbing his stomach. Appellant showed K.S. some money that he had in his sock, stating that he would give K.S. two hundred dollars if he took the boxer shorts off. K.S. took the boxer shorts off, and as he stood naked, appellant told him to sing the verse again, while appellant watched. After K.S. finished the song, appellant told K.S. to "jack off," but K.S. refused. Appellant continued to ask K.S. to masturbate himself, and appellant asked K.S. if appellant could put his hand down K.S.'s shorts. K.S. continued to refuse appellant's requests. Appellant finally told K.S. that he could put his clothes on. After K.S. put his clothes on, appellant hugged K.S. and asked if K.S. loved him. When K.S. said "no," appellant laughed and told K.S. that he could leave. K.S. immediately reported the incident to his mother and never again saw appellant, although appellant called K.S.'s house a few days after the incident.

C.R. testified that when he was 12 years old, appellant took him and J.H., C.R.'s neighborhood friend, to the movies. Appellant drove the boys to the movies, paid for their admission, and bought each of the boys a bag of popcorn. After the movie, instead of taking C.R. and J.H. home, as C.R. had expected, appellant claimed that he was sick and drove the boys to his apartment. Appellant told C.R. to go into the apartment with him because it would take a while. Appellant told C.R. to leave

J.H. in the car because J.H. was asleep. Appellant offered C.R. water to drink and a video game to play downstairs, while appellant went up stairs for a short while. Appellant then called C.R. upstairs and told C.R. that he needed to become a man. C.R. entered appellant's bedroom and saw a female blow-up doll on the floor. Appellant told C.R. that he would not be allowed to leave until C.R. had sex with the doll. C.R. was scared and said "no," but appellant again repeated that he would not be allowed to leave. Appellant told C.R. to take all of his clothes off, and C.R. complied. Appellant told C.R., using crude language, to put his male sexual organ into the doll's female sexual organ, and to continue until C.R. ejaculated. Appellant then told C.R., again using crude language, to put his male sexual organ into the doll's anus. C.R. complied until he ejaculated. At that point, appellant told C.R. that now he was a man. Appellant held a video camera to record the incident with the doll. C.R. clothed himself and returned with appellant to appellant's car, where J.H. had remained for the 30 minutes that C.R. had been in the apartment with appellant.

Appellant's attorney then rebutted the State's rebuttal, by introducing evidence from six boys who had frequently spent time with appellant, who said that appellant had not had any sexual contact with them. Appellant's attorney also presented the testimony of appellant's former girlfriend and recalled Melvina to question her about her veracity and motives to testify against appellant.

## Extraneous Offenses

In his first issue, appellant contends that the trial court erred by admitting into evidence the State's rebuttal testimony of K.S. and C.R. because their testimony concerned extraneous offenses and was offered only to show that appel-

lant was "a sexual predator generally and that he was acting in conformity therewith during the commission of the offenses alleged in the indictment." At trial, appellant objected under Texas Rules of Evidence 403 and 404(b). *See* Tex.R. Evid. 403, 404(b). Appellant asserted at trial, as he does here on appeal, that under rule 404(b), the extraneous offense evidence was inadmissible because (1) the only basis for admission of the extraneous offenses was as character-conformity evidence, specifically, to label appellant as a "sexual predator generally"; (2) there were insufficient distinguishing characteristics common to the extraneous offenses and the charged offense for the extraneous offense evidence to be probative on the issue of appellant's intent concerning the charged offense; (3) the extraneous offenses did not conform to any purpose permissible under rule 404(b), such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, and (4) the State introduced the topics at issue into the trial and thus the topics were not properly subject to rebuttal by the State. *See* Tex.R. Evid. 404(b). Additionally, appellant asserted at trial, as he does here on appeal, that the extraneous-offense evidence should be excluded under rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice due to the trial court's failure to tailor the limiting instruction to the actual theory under which the extraneous offense was admitted. *See* Tex.R. Evid. 403.

We review a trial court's admission of extraneous offense evidence for an abuse of discretion. *Rankin v. State,* 974 S.W.2d 707, 718 (Tex.Crim.App.1996) (op. on reh'g); *Wolfberg v. State,* 73 S.W.3d 441, 443 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd). A trial court does not abuse its discretion as long as its decision

to admit evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391–92 (Tex. Crim.App.1991) (op. on reh'g). Further, a trial court's decision regarding admissibility of evidence will be sustained if correct on any theory of law applicable to the case, even when the court's underlying reason for the decision is wrong.[1] *Romero v. State*, 800 S.W.2d 539, 543–44 (Tex.Crim. App.1990) (citing *Spann v. State*, 448 S.W.2d 128 (Tex.Crim.App.1969)).

■ Evidence may be excluded under rule 403 if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. TEX.R. EVID. 403; *Moses v. State*, 105 S.W.3d 622, 626 (Tex.Crim.App.2003) (citing *Montgomery*, 810 S.W.2d at 387). Courts should consider the following factors under a Rule 403 analysis: (1) the strength of the extraneous offense evidence to make a fact of consequence more or less probable; (2) the potential of the extraneous offense to impress the jury in some irrational but indelible way; (3) the time during trial that the State requires to develop evidence of the extraneous misconduct; and (4) the need by the State for the extraneous evidence. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim.App.2002).

■ Rule 404(b) states that evidence of extraneous offenses is not admissible at the guilt-innocence phase of a trial to prove that a defendant committed the charged offense in conformity with a bad character. TEX.R. EVID. 404(b); *Nobles v. State*, 843 S.W.2d 503, 514 (Tex.Crim.App. 1992). Extraneous offense evidence may be admissible, however, when it has relevance beyond character-conformity, for example, to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.; Moses*, 105 S.W.3d at 626. Rebuttal of a defensive theory is "one of the permissible purposes for which relevant evidence may be admitted under Rule 404(b)." *Moses*, 105 S.W.3d at 626.

■ Extraneous offense evidence may be properly admitted to "rebut the various defensive theories" propounded by a defendant, but it may not be admitted to address a false impression left by the defendant. *See Wheeler*, 67 S.W.3d at 887–88. When a witness leaves the false impression that the accused is not the type of person to commit a certain type of offense, the only proper method to confront the evidence is cross-examination of the witness. *Id.* at 885–86. Appellant never objected at trial, nor has he asserted on appeal, that the extraneous offense evidence was inadmissible to correct a false impression left by appellant.

In *Wheeler*, the court held that, although the extraneous offense evidence that Wheeler had sexually assaulted a young girl at the beach in the presence of others was inadmissible to correct a false impression left by Wheeler, the evidence was admissible to rebut his defensive theory— that he lacked an opportunity to sexually assault his daughter's friend because he was never alone with her, that it was impossible for him to abuse her in a room full of people, and that he was the victim of a conspiracy or frame-up motivated by

---

1. The trial court explained its rationale for admitting the extraneous offense evidence by stating, "[I]t just seems to me that the impression in front of the jury is just so unfair if I don't allow the State to rebut it." We need not determine whether the trial court stated a proper reason for admitting the evidence because we need only determine whether the trial court's decision was correct on any theory of law applicable to the case. *See Romero v. State*, 800 S.W.2d 539, 543–544 (Tex.Crim. App.1990) (citing *Spann v. State*, 448 S.W.2d 128 (Tex.Crim.App.1969)).

greed. *Id.* at 887. As in *Wheeler*, the State here asserted alternate reasons why the rebuttal evidence was admissible. *See id.* at 886. Also as in *Wheeler*, one of the State's asserted reasons was erroneous, specifically, that the extraneous offense evidence was admissible to confront the false-impression evidence.[2] *See id.* at 885. But again, as in *Wheeler*, the State offered an alternate reason, that the extraneous offense evidence was admissible to rebut defensive theories propounded by the defendant. *See id.* at 888–89. We conclude, therefore, that although the extraneous offense evidence would be inadmissible to confront false-impression evidence, the State's alternate reason, that the extraneous offense evidence was admissible to rebut defensive theories propounded by the defendant, was a proper basis for the admission of the extraneous offense evidence, as long as the evidence complied with rules 404(b) and 403. *See id.*

### Appellant's Defensive Theories

We conclude that two of appellant's many defensive theories introduced at trial—that appellant lacked the intent to have sexual contact with J.H. and that appellant was the victim of a frame-up by J.H. and Melvina—were properly subject to rebuttal by the State. As a preliminary matter, however, we must address appellant's assertion that the State cannot open the door to evidence that it later seeks to rebut.

### 1. State's Introduction of Evidence

On appeal, appellant generally contends that the State may not rely on its own questioning to open the door to collateral matters and extraneous offenses that would otherwise be inadmissible, but appellant does not refer specifically to any theory. At trial, appellant argued to the trial court that, because the State introduced evidence concerning appellant's lack of girlfriends, the State could not open the door to evidence responsive to that issue.

■ As a general rule, the defensive theory that the State wishes to rebut through the use of extraneous offense evidence must be elicited on direct examination by defense and may not by elicited by "prompting or maneuvering" by the State. *Wheeler*, 67 S.W.3d at 885; *Shipman v. State*, 604 S.W.2d 182, 185 (Tex.Crim.App. 1980) (*stating* that State "may not rely on its own questioning" to get into collateral matters, extraneous offenses, and bad acts that "would otherwise be inadmissible").

The record supports appellant's assertion that the State introduced evidence that appellant had never had a girlfriend. Having introduced appellant's lack of girlfriends into evidence, the State could not introduce rebuttal evidence concerning that topic. *See id.* The two defensive theories, however, that we conclude were properly subject to rebuttal by the State— that appellant lacked the intent to have sexual contact with J.H. and that appellant was the victim of a frame-up by J.H. and Melvina—were not pertinent to the issue of whether appellant lacked girlfriends, which was the issue initially introduced by the State. The record shows that appellant, rather than the State, introduced the

---

**2.** The State's argument concerning false impression evidence was as follows:

And it certainly has created this impression that [the defendant], you know, is just this great guy who runs a football team out of the kindness of his heart. . . . It goes to the whole impression that [the defense is] leaving with the jury that this is just a nice guy who is taking care of boys who had no good parents who just did a football team for little league out of the kindness of his heart. I mean, I think they have left this impression—and then even more so by saying the complainant is a liar—that they have left a completely false impression with the jury that I think I'm allowed to rebut.

defenses that he lacked intent to have sexual contact with J.H. and that he was the victim of a frame-up.

## 2. Lack of Intent

 The State asserts on appeal, as it did at trial, that the extraneous offenses are admissible to rebut the defensive theory that appellant lacked the intent to have sexual contact with J.H.[3] The defense asserted the theory that appellant had no intent to have sexual contact with J.H. because his relationship with young boys consisted only of doing kind acts for them as a father figure. During the prosecutor's arguments to the trial court seeking a ruling that would allow her to introduce the rebuttal-extraneous-offense evidence, the State's attorney argued that "it goes to show clearly his intent with the Complainant in this case.... They are implying that he just helps boys because he let Glen and Fred live with him and he did this ... to be kind. And I think it goes to rebut that."

The record reflects that appellant introduced the defense that he lacked the intent to commit a sexual offense against J.H. during his cross-examination of Melvina Stepherson by questioning her as follows:

[Appellant's attorney:] Didn't [appellant] take care of Glen and Fred?

[Melvina Stepherson:] Yeah, for about two years.

[Appellant's attorney:] Okay. They actually lived [with appellant], Blackwell, right?

[Melvina Stepherson:] (Nods in the affirmative.)

. . . .

[Appellant's attorney:] [Appellant] more or less helped raise those boys [Glen and Fred]?

[Melvina Stepherson:] After they were—teenage, yes.

[Appellant's attorney:] And he provided for them?

[Melvina Stepherson:] They said— yeah, he did, when they stayed with him.

[Appellant's attorney:] He was almost like a father to those boys, wasn't he?

[Melvina Stepherson:] While they were staying with him, yes.[4]

Appellant's attorney continued to pursue this defensive theory through Glen Stepherson. During the direct examination of Glen Stepherson, appellant's attorney questioned him as follows:

[Appellant's attorney:] Now why was it that [appellant] was taking care of you and your brother?

[Glen Stepherson:] Because when we were little, we never—we never got that much stuff when we were little.

[Appellant's attorney:] But why was he taking care of you, as opposed to, let's say, your mother or father?

3. On appeal, the State reasserts this argument by stating that the extraneous offense evidence was admissible because "it rebutted [a]ppellant's suggestion that he was not the sort of person that would commit the charged offense" and that the evidence therefore "had relevance apart from character conformity."

4. At this point in the trial, the extent of Melvina Stepherson's testimony concerning appellant's relationship with Glen and Fred was her statement that appellant had purchased a pair of sneakers for J.H., but she "didn't think

anything of it" because appellant "always bought things" for her "two grandsons." She did not give any other details about appellant's relationship with her "two grandsons" or state their names or whether they were children or adults. We therefore conclude that her testimony during the State's direct examination did not open the door to appellant's defensive theory that he lacked the intent to have sexual contact with J.H. because his relationship with J.H., as with Glen and Fred, was as a father figure only.

[Glen Stepherson:] Because I never knew my dad until I was 7.... And my mom was always in the streets or in jail somewhere.

[Appellant's attorney:] Okay. And it was your grandmother that let [appellant] raise you; is that right?

[Glen Stepherson:] Her and my mother.

[Appellant's attorney:] And your mother. Okay. And [appellant] would discipline you from time to time just like a regular parent; is that right?

[Glen Stepherson:] Yes. Sir.

[Appellant's attorney:] Okay. Did he get you back in school and try to set you on the right track?

[Glen Stepherson:] Yes, sir.

[Appellant's attorney:] Okay. Do you think he did a good job of raising you?

[Glen Stepherson:] Yes, sir.

By asserting that appellant was a like a regular parent who did a good job of raising two other young boys, appellant impliedly suggested that he lacked the intent to have sexual contact with J.H. The implication of the evidence that described appellant's role as a father to Glen and Fred, in conjunction with evidence that suggested that appellant assumed a similar parental-type role with J.H., was that appellant lacked the intent to commit a sexual offense against J.H.

Although the questioning of these witnesses may have only impliedly suggested that appellant lacked the intent to commit a sexual offense against J.H., the defense's closing argument to the jury directly asserted that appellant lacked that intent. In his closing argument, appellant's attorney confirmed that suggestion by arguing that, if appellant had intended sexual conduct with J.H., the contact would have escalated into sexual assault, rather than remain at the level of masturbation-type conduct only. Appellant's attorney stated:

> The other thing that struck me as strange about the case, they are claiming it took place over a five-year period and, for some reason, the only thing the defendant would do would be either touch the penis or have his penis touched. I mean does it really make any sense that if the defendant was a pedophile, as they are apparently trying to claim, that's all that he would do over a five-year period? Doesn't it make more sense that the sexual activity would escalate, there would be an attempt to have anal or oral sex? There was never any testimony about that. I mean, the facts of the case just don't make any sense.

The defensive theory that appellant lacked the intent to commit the offense was thus introduced into the case and was subject, therefore, to rebuttal by the State. *See* Tex.R. Evid. 404(b); *Moses*, 105 S.W.3d at 626.

**2. Appellant as Victim of Frame–Up**

█ Alternatively, and as an independent reason that would allow the admission of the extraneous offense evidence as rebuttal evidence, we conclude that the evidence was admissible to rebut appellant's defensive theory that he was the victim of a frame-up. As the State's attorney stated at trial, the extraneous offenses were admissible "to rebut all the [defensive] theories" because appellant "opened the door" to the evidence.

The record demonstrates that appellant introduced the defensive theory that he was the victim of a frame-up by Melvina Stepherson, who pressured J.H. to falsely accuse appellant because there was bad blood between his family and her family. Appellant's defensive theory raised the issue that Melvina Stepherson had threat-

ened to send J.H. to reform school and have perjury charges filed against him if he recanted the allegations against appellant. The record reflects that appellant's attorney introduced this theory into the trial when he cross-examined Melvina Stepherson and J.H., and he continued to pursue the theory in closing arguments to the jury, which included the following statement:

> He [J.H.] has been pressured by his grandmother to stick with the story.... [Melvina Stepherson and J.H.] are discussing the story together to get the story straight, basically. You have heard the testimony that they told him, "Look, if you say that this didn't happen, you could go to reform school over this case. You could be in serious trouble."

The record thus demonstrates that appellant propounded two defensive theories—that he lacked the intent to commit a sexual offense against J.H. and that he was the victim of a frame-up by Melvina Stepherson—that were subject to rebuttal evidence by the State, as long as the evidence also complied with the specific requirements under Rule 404(b) and Rule 403. *See* Tex.R. Evid. 404(b), 403.

### Rule 404(b)

■ As noted more fully above, to be admissible under Rule 404(b), the extraneous evidence must have probative value beyond character conformity. Tex.R. Evid. 404(b). To be probative, the extraneous offense evidence admitted to rebut a defensive theory must be similar to the charged offense. *See Wheeler*, 67 S.W.3d at 888–89 (*holding* extraneous offense similar to charged offense because in both cases defendant reached underneath young girl's outer clothing and touched her private parts while family member was nearby); *Plante v. State*, 692 S.W.2d 487, 492–93 (Tex.Crim.App.1985) (*holding* that high degree of similarity between extraneous

and charged offense used in cases proving modus operandi not required when purpose of proof is to show intent); *Johnston v. State*, 418 S.W.2d 522, 525–26 (Tex. Crim.App.1967) (*holding* that trial court did not abuse discretion by allowing evidence of extraneous offense to rebut defendant's theory of frame-up under circumstances showing that charged offense concerned victim who visited defendant's apartment several times during which defendant talked victim into "hypnotizing him with a vibrator" and "kissing him on the stomach" to help victim "with girls, sex and stuff," because extraneous offense concerned similar facts that defendant "played around" with another boy in car and asked boy to spend night and have sexual relations); *Dennis v. State*, 178 S.W.3d 172, 179 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd) (*holding* that extraneous offense evidence admitted to rebut defensive theory of frame-up need not be signature crime or nearly identical to charged offense; rule 404(b) requires only similarity to charge offense).

■ At trial, the State's theory for admissibility of the extraneous offense evidence in the rebuttal phase of trial was that the extraneous offenses were sufficiently similar to the charged offense to be probative on the issue of appellant's intent with J.H. The State explained to the trial court that appellant used the same means to entice both K.S. and C.R. to be alone with him and that appellant gained each boy's trust by giving items or services of value so that appellant would be alone with each boy to commit sexual acts. As the State's attorney told the trial court,

> ... it's the same habit that he is showing by buying them things, by doing nice things for them. Like in [K.S.'s] case, you know, he offered to let them record for free when clearly it was his business, he had them over there. With [C.R.], it

was just a friend of J.H.'s; and he took them to the movies, to Celebration Station, [and] bought him things. I mean, I think it all goes to his habit about how he ingratiated himself with these boys and then uses that as a vehicle to commit sexual acts against them.

The record shows sufficient similarities between the extraneous offenses and the charged offense to make the extraneous offenses probative evidence of appellant's intent with J.H. With respect to K.S., the record reflects the following similarities between appellant's conduct with him and J.H.: (1) both K.S. and J.H. are young boys: K.S. was about 13 years of age and J.H. was between the ages of 8 and 12 at the time of the conduct with appellant; (2) appellant gave gifts or services of value to both K.S. and J.H.: he purchased sneakers and other items for J.H. and allowed K.S. and his friends to record music at his studio free of charge; (3) both boys were taken to a room inside appellant's recording studio that had a cotton-looking substance on the walls; (4) both boys were told to take their clothes off; (5) masturbation, i.e., using a hand to touch or to attempt to touch a male sexual organ, was the only form of sexual conduct with both boys; (6) the sexual conduct took place when other people were present in the recording studio; (7) both boys were threatened or intimidated by appellant to get them to comply with appellant's requests: J.H. was told he would get a "whipping," and K.S. felt that he could not leave while appellant stood by the locked door; (8) the offense against K.S. took place in July, 2000, which was in the same October, 1998, to September, 2002, time period in which the offenses against J.H. took place.

The only dissimilarities between appellant's conduct with K.S. and J.H. concern minor details of the sexual contact. Spe-cifically, during the assault of J.H. at the recording studio, appellant pulled his own pants down and had J.H. rub appellant's private part. But, with K.S., appellant rubbed K.S.'s stomach, told K.S. to masturbate himself, and asked K.S. for permission to put his hand down K.S.'s shorts. Despite these minor differences in the specifics of the masturbation conduct, there are sufficient similarities between the sexual conduct involving J.H. and K.S. for K.S.'s extraneous offense evidence to be probative as rebuttal evidence to show appellant's intent to commit a sexual act with J.H.

Concerning the similarities between the offenses against J.H. and C.R., the record shows the following: (1) both C.R. and J.H. are young boys: C.R. was about 13 years of age and J.H. was between the ages of 8 and 12 at the time of the conduct with appellant; (2) appellant purchased gifts or services of value for both J.H. and C.R.: he purchased sneakers and other items for J.H. and purchased a movie ticket for C.R. and took him to Celebration Station; (3) both boys had sexual experiences with appellant in the bedroom of his apartment; (4) both boys were told to take their clothes off; (5) appellant threatened or intimidated both boys to get them to comply with appellant's requests: J.H. was told he would get a whipping if he did not disrobe, and C.R. was told that he would not be allowed to leave until he had sex with a blow-up doll; and (6) the nature of the sexual conduct with both boys was masturbation type conduct only, i.e., appellant had J.H. touch appellant's genitals with J.H.'s hand and appellant touched J.H.'s genitals with appellant's hand, and appellant directed C.R. to ejaculate through self-gratification with a blow-up doll.

The actual details of the sexual contacts are the only dissimilarities between appel-

lant's conduct with C.R. and J.H. With J.H., appellant had J.H. masturbate appellant, and appellant masturbated J.H.; with C.R., appellant did not touch himself or have C.R. touch appellant, but instead directed C.R. to have vaginal and anal intercourse with the female blow-up sexual doll, which appellant recorded on videotape. Yet, despite differences in the details of the actual masturbation conduct, the circumstances show a sufficient number of similarities to appellant's conduct with J.H. to be probative of appellant's intent to commit a sexual act with J.H. *See Plante*, 692 S.W.2d at 492–93 (*holding* that high degree of similarity not required when purpose of proof is to show intent); *Johnston*, 418 S.W.2d at 525–26 (*holding* that extraneous offenses that involved different sexual acts were sufficiently similar to be admissible to rebut frame-up defense).

The two extraneous offenses that the trial court admitted into evidence here were probative of appellant's intent because they were similar to appellant's misconduct with J.H. and thus rebutted appellant's defensive theories that he lacked the intent to commit a sexual offense against J.H. and that appellant was the victim of a frame-up by Melvina Stepherson. Although the rebuttal extraneous offenses are not signature crimes by appellant and differ in the details of the sexual criminal offenses he committed, they are sufficiently similar to the charged offense to be probative evidence of appellant's intent to commit a sexual offense against J.H. and to refute the theory that appellant was the victim of a frame-up by Melvina Stepherson.

### Rule 403

 The rebuttal extraneous offense evidence also met the requirements of rule 403 of the Rules of Evidence because the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403; *Moses*, 105 S.W.3d at 626 (citing *Montgomery*, 810 S.W.2d at 387). Further, the factors for admission of the rebuttal extraneous offense evidence show that rule 403 does not preclude admission of the evidence. *See Wheeler*, 67 S.W.3d at 888.

The first factor, the strength of the extraneous offense evidence to make a fact of consequence more or less probable, weighs strongly in favor of admissibility. The extraneous offense evidence was probative of appellant's intent to commit the sexual offense against J.H. by showing that appellant had a similar sexual intent with K.S. and C.R., as well as a similar pattern of enticing boys to accompany him alone after giving valuable gifts to them. Additionally, because nothing in the record indicates that either victim of the two rebuttal extraneous offenses had any motive to frame appellant for the sexual allegations made against him, the rebuttal evidence was also probative of whether Melvina Stepherson was framing appellant for the sexual offense committed here.

The second factor requires that we examine the rebuttal-extraneous-offense evidence for its potential to impress the jury in some irrational but indelible way. The trial court's instructions to the jury are a factor to consider in determining whether the jury considered the extraneous-offense evidence improperly, i.e., as character conformity evidence, or properly, as evidence to rebut a defensive theory or some other permissible reason under rule 404(b). *See Owens v. State*, 827 S.W.2d 911, 916–17 (Tex.Crim.App.1992).

The trial court instructed the jury in this case as follows:

You are further instructed that if there is any evidence before you regarding the defendant's committing an alleged offense or offenses other than the offense against him in the indictment in

this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

The trial court's instruction properly limited the jury's reliance on the extraneous offense evidence to issues that appellant raised, specifically, his motive and intent to commit the sexual offense against J.H. The trial court's instruction for the jury to consider the extraneous offense in determining appellant's preparation, plan, opportunity, knowledge, identity, or absence of mistake or accident amounted to surplusage that the jury could readily disregard because those issues were not pertinent to the trial. Although the charge did not address appellant's defensive theory, that he was the victim of a frame-up by Melvina Stepherson, the charge specifically limited the extraneous offense evidence to issues other than character conformity. Therefore, although not as narrowly tailored to the specific issues involved as it could have been, the charge correctly instructed the jury to limit its use of the extraneous offense evidence to issues that were properly before it—the intent and motive of appellant to commit the offense against J.H.

The jury charge here is unlike the charges in *Owens v. State* and *Daggett v. State* that the Court of Criminal Appeals held were improper. *See Owens*, 827 S.W.2d at 917; *Daggett*, No. PD–0503–03–CR, 187 S.W.3d 444, 446 (Tex.Crim.App. 2005). In *Owens*, the trial court erred by instructing the jury to consider extraneous evidence only for the limited purpose of "determining the system of the Defendant" because no evidence at trial showed that the extraneous offense was the system or unusual handiwork of defendant, no issue was raised about defendant's "identity or lack of mistake," and the only evidentiary issue at trial pertained to an implied frame-up defensive theory, an issue not included in the jury charge. *See Owens*, 827 S.W.2d at 917. In *Daggett*, the trial court erred by instructing the jury to consider the extraneous offense evidence only for the limited purpose of "determining the common plan or scheme" of the defendant because no evidence at trial showed that the extraneous offense was the plan or scheme of the defendant and the extraneous offense was only admissible to rebut "appellant's blanket statement of good conduct with minors," an issue not included in the jury charge. *Daggett*, 187 S.W.3d at 454. In *Owens* and in *Daggett*, the only limitation on the jury's consideration of the extraneous offense related to an issue that was not raised by the evidence at trial. *See id.; Owens*, 827 S.W.2d at 913. Here, however, the jury was properly instructed to consider the extraneous offense evidence in determining the intent and motive of appellant with J.H., issues that were raised by the evidence before the jury. Moreover, the charge here, unlike *Owens* and *Daggett*, instructed the jury to consider the evidence "for no other purpose" than as evidence of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant," and the jury was therefore by implication instructed not to consider the extraneous offense evidence as substantive evidence of appellant's guilt. The concern in *Owens* and *Daggett*, that the jury charge limited the extraneous offense evidence to an impermissible consideration only, is not present here. The jury charge

here properly instructed the jury to consider the extraneous offense evidence in determining the motive and intent of appellant with J.H., and it limited the jury's use of the evidence to use other than as substantive evidence of appellant's guilt.

The closing arguments by both attorneys here also explained that the jury could not consider the extraneous offenses as character-conformity evidence. The State emphasized that the jury could not consider the extraneous offense evidence as showing that "because he did something to the other boys he must have done it to J.H." Additionally, the State correctly informed the jury that it could consider the extraneous offense evidence only as evidence that rebutted the defensive theories.[5] Appellant's attorney also correctly informed the jurors that they "cannot convict just based on the fact that you heard those other cases" and that the jury had to "separate those cases out and focus on the J.H. case and ask . . . [d]id the State prove its case beyond a reasonable doubt?"[6]

In summary, the jury instruction here served to inform the jurors that they could consider the extraneous offense evidence only for purposes other than character conformity, and both attorneys thoroughly explained both the charge and the court's instruction to consider the extraneous offense evidence within those limited parameters. The jury here was therefore adequately apprised that it could rely on the extraneous offense evidence solely for other purposes than character-conformity evidence.

In further analyzing the second factor, which requires an assessment of whether the rebuttal extraneous offense evidence had the potential to impress the jury in some irrational but indelible way, the record shows that the testimony was not overly graphic, although the nature of the sexual offenses was prejudicial because of the emotional weight associated with them. Taking that prejudicial effect into consideration, however, and weighing it against

5. The State's attorney explained the court's jury charge concerning rebuttal evidence as follows:

Let's talk about K.S. and C.R. and why they came into court. They came into court, and you get a charge on this, not to say that because he did something to the other boys he must have done it to J.H. They didn't come for that purpose. They came for the purpose of showing you that—you know, all the testimony you heard from the defense witnesses, he is a good guy, he helped raise these two boys who didn't have parents who could take care of them, [J.H.] is a liar, all these different things. They came to you for the purpose of rebutting that. Now, you know that [appellant] is not this great guy who, out of the generosity of his heart, just helps these poor wayward boys.

6. Appellant's trial attorney explained the trial court's charge in his closing statements to the jury, as follows:

We're trying the J.H. case. Weren't trying the C.R. case. Weren't trying the K.S. case.

Those cases can be handled by a different jury, or however they are going to be handled. But those are separate cases from this case, and you cannot convict Mr. Blackwell just because you have heard evidence on those cases.

. . . .

There is a tendency that . . . when you hear about other cases, that you're going to be blinded by the other cases and it's going to overwhelm you. And you say, "We heard about the other cases. This case must be true." Well, the charge tells you you cannot convict him on the J.H. case just because you convicted—if you do, on these other cases because you're not being asked about the other cases to convict him; but that's not what the law is. The law tells you—there is an instruction in the charge about what the law is, but you cannot convict just based on the fact that you heard those other cases. So, what you have got to do is you really have to separate those cases out and focus on the J.H. case and ask yourself: Did the State prove it's case beyond a reasonable doubt?

the trial court's instructions in the jury charge and both attorneys' closing arguments, this factor weighs only slightly in favor of excluding the extraneous offense evidence.

The third factor evaluates the time during trial that the State required to develop evidence of the extraneous misconduct. The record here shows that testimony concerning the extraneous offenses was not unduly lengthy. The details of the extraneous offense evidence were presented only through the testimony of K.S. and C.R. In addition, two police officers gave very brief testimony concerning why charges were not immediately filed for the extraneous offenses involving K.S. and C.R. This factor is neutral and favors neither admissibility nor exclusion of the evidence.

The fourth and final factor examines the State's need for the extraneous evidence. This factor weighs heavily in favor of admissibility here. The State presented J.H., Melvina Stepherson, and two police officers, who testified about their investigation after J.H. reported to them. At the time of trial, J.H. was a 13–year–old boy. His testimony was extensively impeached by many defense witnesses stating that he was not a credible person; by his own admission that he lied 50 percent of the time; by prior statements that he made in writing, on audiotape, and to various witnesses, stating that he had no sexual experiences with appellant; and by assertions that jealousy over appellant's attention towards Glen and Fred Stepherson motivated his accusations. Melvina Stepherson's testimony was impeached by her admission that she did not report the offense to police officers when J.H. first reported it to her, and called into question by the defense's allegation that she was framing appellant. There was neither physical evidence to connect appellant to the offense against J.H., nor any eyewitnesses. Likewise, there was no evidence, other than J.H.'s and Melvina Stepherson's testimony, to establish appellant's guilt for the offense against J.H.

Considering all four factors together, although the second factor here would support excluding the extraneous offense evidence, the first and fourth factors weigh heavily in favor of admissibility. The evidence was highly probative as rebuttal evidence against the defensive theories, lack of intent and frame-up, and the State's need for the evidence was strong. Yet, the trial court's jury charge and both the prosecutor and appellant's counsel's closing arguments instructed the jury that it could not convict appellant based solely on a belief that he had committed the two extraneous offenses and acted in conformity with those offenses but could consider those offenses as evidence of appellant's intent with J.H. Because the probative value of the extraneous offense rebuttal evidence was not, therefore, substantially outweighed by the danger of unfair prejudice, the trial court did not abuse its discretion by admitting the evidence. *See Moses,* 105 S.W.3d at 627 (*holding* that trial court's admission of extraneous evidence is reviewed for abuse of discretion).

We hold that the extraneous offense evidence was properly admitted to rebut appellant's defensive theories, and the evidence was admissible under rules 404(b) and 403. We overrule appellant's first point of error.

### Commitment Question

 In his second point of error, appellant contends that the trial court erred by allowing the State, over his objection, to pose an improper commitment question to the venire panel and by excusing a juror who responded to the State's question. Appellant further complains that the trial

court erred by allowing the State to ask whether the prospective jurors could convict upon the testimony of one male, child witness, as the testifying victim in a sexual assault case.

▮▮▮▮▮ Questions during voir dire are proper if they seek to discover a juror's views on an issue applicable to the case. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim.App.2002) (*citing Smith v. State*, 703 S.W.2d 641, 643 (Tex.Crim.App.1985)). Voir dire examination permits the parties to assess the desirability of prospective jurors and to select a "competent, fair, impartial, and unprejudiced jury[.]" *Staley v. State*, 887 S.W.2d 885, 896 (Tex. Crim.App.1994) (citation omitted). Because a trial court has broad discretion over the process of selecting a jury, an appellate court should not disturb a trial court's ruling on the propriety of a particular question during voir dire absent an abuse of discretion. *Barajas*, 93 S.W.3d at 38.

▮▮▮▮▮ An attorney may not, however, "attempt to bind or commit a venire member to a verdict based on a hypothetical set of facts." *Lydia v. State*, 109 S.W.3d 495, 497 (Tex.Crim.App.2003). "Commitment questions are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact." *Standefer v. State*, 59 S.W.3d 177, 179 (Tex.Crim.App. 2001). While these types of questions generally "elicit a 'yes' or 'no' answer, an open-ended question can be a commitment question if the question asks the prospective juror to set the hypothetical parameters for his decision-making." *Id.* at 180. Commitment questions that attempt to bind prospective jurors to a position, using a hypothetical or otherwise, are improper and "serve no purpose other than to commit the jury to a specific set of facts before

the presentation of any evidence at trial." *Lydia*, 109 S.W.3d at 497.

▮▮▮▮ Not all commitment questions, however, are improper. *Standefer*, 59 S.W.3d at 179–83; *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex.Crim.App.2005) (stating, "An improper commitment question attempts to create a bias or prejudice in the venireman before he has heard the evidence, whereas a proper voir dire question attempts to discover a venireman's preexisting bias or prejudice."). In *Standefer*, the Texas Court of Criminal Appeals articulated a three-prong test for determining whether a voir dire question calls for an improper commitment. *Standefer*, 59 S.W.3d at 179–83. The first prong requires the trial court to decide whether a particular question is a commitment question. *Id.* at 179–81. If the court determines that a particular question is a commitment question, the second prong requires the court to consider whether the question leads to a valid challenge for cause. *Id.* at 181–82. If the question meets the "challenge for cause" requirement, the third prong requires the court to determine whether the question includes only those facts necessary to test whether a prospective juror is challengeable for cause. *Id.* at 182–83.

▮▮▮▮ It is proper for the State to ask during voir dire if jurors can convict on the testimony of one witness if the jurors believe that witness beyond a reasonable doubt on all of the necessary elements that establish an offense because a negative answer by a juror to the question makes the prospective juror challengeable for cause. *See Castillo v. State*, 913 S.W.2d 529, 533 (Tex.Crim.App.1995) (*holding* juror challengeable for cause because juror would not convict on basis of single witness's testimony even if testimony sufficient to convince juror of guilt beyond a reasonable doubt).

■■■■■ During voir dire, the following exchange occurred:

> [Prosecutor:] So, the law says that you can look at evidence—if I can prove my case, my indictment, through one witness, the law says if you believe that witness beyond a reasonable doubt, and that witness can prove each and every element of the indictment, you can find the person guilty based on that witness' testimony. Okay? So, let's go row by row and find out how you feel about what the law says with regard to one witness, okay? How do you feel? Can you follow that law?

> [Appellant's attorney:] Your honor, excuse me. I would object to the State—I would object to the voir diring on the issue of whether they can convict on the testimony of one witness and one witness alone. That's improper voir diring, asking a jury to commit to a certain set of facts.

This was the sole objection by appellant's attorney during voir dire to any question about the "one witness rule"—that the testimony of one witness is sufficient to convict if the jurors believe that witness beyond a reasonable doubt. *See Castillo,* 913 S.W.2d at 533–34. By objecting to this question at trial, appellant has preserved the right to complain about it on appeal, but appellant has waived his other voir dire complaints because he failed to object to those questions at trial.[7]

The State's voir dire asked the jurors if they could follow the law that allows a jury to convict on the testimony of one witness that has established all of the elements of the offense beyond a reasonable doubt. In considering the first prong of the *Standefer* test, we note that the question could be answered with a "yes" or "no," and that the question asked the jurors to commit to the law that allows for a jury to convict on the testimony of one witness alone when the jury believes the one witness beyond a reasonable doubt on each of elements of the offense. *See Standefer,* 59 S.W.3d at 179. Although the question was a commitment question, it was not improper, however, because it met the second and third prongs of the *Standefer* test. *See id.* at 179–83. The second prong, which requires the court to consider whether the question leads to a valid challenge for cause, is met here because the State's question attempts to discover whether any of the prospective jurors harbor a preexisting bias or prejudice concerning the ability of the jurors to convict in accordance with the "one witness rule." *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) (Vernon Supp.2005). As set forth above, a juror who would require more evidence than necessary to prove a case beyond a reasonable doubt would be subject to a challenge for cause. *Castillo,* 913 S.W.2d at 533–34. The third prong that requires the court to determine whether the question includes only those facts necessary to test whether a prospective juror is challengeable for cause is also met here because this question did not include any extraneous details about appel-

---

**7.** On appeal, appellant complains that the State's voir dire questions included the fact that the victim was a male child and called for the jurors to assess the credibility of a boy witness who giggles in response to the question, "and how did you feel when he touched your penis?" Appellant, however, did not object to these questions at trial, and has therefore waived his complaint on appeal. *See* TEX.R.APP. P. 33.1; *Broxton v. State,* 909 S.W.2d 912, 918 (Tex.Crim.App.1995). Appellant also complains that the trial court excused a juror for cause improperly, thereby giving the State an extra peremptory strike, in violation of equal protection of the laws. Appellant, again, did not object on this basis at trial, thus waiving this complaint. *See* TEX. R.APP. P. 33.1; *Broxton,* 909 S.W.2d at 918.

lant's charged offense. *See Standefer*, 59 S.W.3d at 182–83.

We thus hold that the question asked by the State during voir dire that asked the jurors if they could follow the law that allows a jury to convict on the testimony of one witness that has established all of the elements of the offense beyond a reasonable doubt was a proper voir dire question.

We overrule appellant's second issue.

## Ineffective Assistance of Counsel

■ In his third point of error, appellant contends that he was denied effective assistance of counsel at the guilt or innocence phase of trial when his attorney did not object to testimony regarding the credibility of J.H.

■ To prevail on a claim of ineffective assistance of counsel, the defendant must show that trial counsel's performance was deficient and a reasonable probability exists that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The first prong of the *Strickland* test requires that the defendant show that counsel's performance fell below an objective standard of reasonableness. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App. 1999). Thus, the defendant must prove objectively, by a preponderance of the evidence, that trial counsel's representation fell below professional standards. *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex.Crim. App.2002). The second prong requires that the defendant show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *Thompson*, 9 S.W.3d at 812. Because the reviewing court must, however, indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Any allegation of ineffectiveness must be firmly founded in the record, which must demonstrate affirmatively the alleged ineffectiveness. *Thompson*, 9 S.W.3d at 813 (*citing McFarland v. State*, 928 S.W.2d 482, 500 (Tex.Crim.App. 1996)). We will not speculate to find trial counsel ineffective when the record is silent on counsel's reasoning or strategy. *Robinson v. State*, 16 S.W.3d 808, 813 n. 7 (Tex.Crim.App.2000). In rare cases, however, the record can be sufficient to prove that counsel's performance was deficient, despite the absence of affirmative evidence of counsel's reasoning or strategy. *Id.*

■ It is generally improper for a witness to offer a direct opinion as to the truthfulness of another witness and such opinion is therefore inadmissible evidence. *See Schutz v. State*, 957 S.W.2d 52, 59 (Tex.Crim.App.1997) (*holding* testimony that complainant did not exhibit evidence of fantasizing, that manipulation was less likely explanation for complainant's allegations, and that complainant's allegations were not result of fantasy constituted direct comments on truth of allegations). This type of testimony is inadmissible "because it does more than 'assist the trier of fact to understand the evidence or to determine a fact in issue;' it decides an issue for the jury." *Yount v. State*, 872 S.W.2d 706, 709 (Tex.Crim.App.1993). This rule applies to expert and lay witness testimony alike. *Arzaga v. State*, 86 S.W.3d 767, 776 (Tex.App.-El Paso 2002, no pet.); *Fisher v. State*, 121 S.W.3d 38, 41 (Tex.App.-San Antonio 2003, pet. ref'd).

The record shows that Melvina testified without objection that she believed J.H.

when he reported to her that he was abused by appellant, even though she did not report the abuse to police authorities. The record also shows that Officer Frost testified that she determines whether a victim of a sexual offense is believable by looking for consistency, details, and prior exposure to sexual experiences, and that no alarms were raised during her interview with J.H. Appellant did not obtain a motion for new trial hearing, and no direct evidence in the record establishes why appellant's attorney did not object at trial to the testimony complained of on appeal. We must, therefore, presume that counsel had a plausible reason for his actions. *Thompson*, 9 S.W.3d at 814. From our review of the record, we cannot conclude that there could be no plausible reason for counsel's decision not to object to this testimony at trial. *See Robinson*, 16 S.W.3d at 813 n. 7. We conclude that appellant has not met his burden of proving ineffective assistance of counsel by a preponderance of the evidence. *See Mitchell*, 68 S.W.3d at 642.

We overrule appellant's third point of error.

### Conclusion

We affirm the judgment of the trial court.

Justice JENNINGS, dissenting.

TERRY JENNINGS, Justice, dissenting.

In its discussion of appellant's first issue, the majority makes a series of critical mistakes that results in its erroneous conclusion that the trial court did not err in admitting the extraneous offense testimony of K.S. and C.R., which was offered by the State in its rebuttal case against appellant.

The majority misidentifies evidence that bolstered appellant's good character as evidence that appellant *"lacked the intent* to have sexual contact with [the complainant]"* because appellant "was like a regular parent who did a good job of raising two other young boys."[1] (Emphasis added.) From this, the majority further errs in concluding that "[t]he defensive theory that appellant *lacked the intent* to commit the offense was thus introduced into the case and was subject, therefore, to rebuttal by the State." (Emphasis added.) The majority also erroneously concludes that appellant "introduced the defensive theory that he was the victim of a frame-up by Melvina Stepherson." Having erroneously concluded that "appellant propounded two defensive theories—that he lacked the intent to commit a sexual offense against [the complainant], and that he was the victim of a frame-up by Melvina Stepherson," the majority further errs in concluding that the State's rebuttal extraneous offenses "are sufficiently *similar* to the charged offense to be probative evidence of appellant's intent to commit a sexual offense against [the complainant] and to refute the theory that appellant was the victim of a frame-up by Melvina Stepherson." (Emphasis added.)

As noted by the State itself, in its briefing to this Court, "[w]hen the State introduced evidence [that appellant] had

---

1. Evidence that appellant acted as a "father figure" to two other boys was in fact evidence of good character and had nothing to do with whether appellant, "with intent to arouse the sexual desire of [himself], [had] sexual contact with [the complainant] ... by having the complainant touch [appellant's] genitals."

Under our penal code, "[a] person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a) (Vernon 2003).

sexually abused two other teenage boys, it rebutted Appellant's suggestion that he was not the sort of person that would commit the charged offense." Here, however, as discussed below, the State did not properly attempt to correct any such false-impression inferences created by the testimony of appellant's witnesses through cross-examination of those witness. Rather, the State improperly "rebutted appellant's suggestion" by calling two other witnesses to correct it with testimony about two notably dissimilar extraneous offenses, and the trial court reversibly erred in allowing the State to do so.

Accordingly, I respectfully dissent.

## The Issue Presented

In his first issue, appellant argues that the trial court erred in admitting into evidence the State's rebuttal testimony of K.S. and C.R. because their testimony concerned extraneous offenses and was offered to show only that appellant was "a sexual predator generally and that he was acting in conformity therewith during the commission of the offenses alleged in the indictment."

In its response to appellant's first issue, the State notes that, in anticipation of appellant's impeachment of the complainant's credibility, it elicited testimony from the complainant concerning his many inconsistent statements. In fact, appellant then did, as the State contends, cross-examine the complainant about his inconsistent statements and later called several witnesses "who claimed that [the complainant] was not a truthful person and had a reputation for dishonesty." The State also notes that appellant "repeatedly elicited testimony that he had many girlfriends throughout his life."

In stark contrast to the majority's characterization of appellant's two defensive theories, the State concedes that "the de-

fense's two primary themes" at trial consisted of appellant's effort to (1) "discredit [the complainant] and convince the jury he had fabricated his claims of sexual abuse and was not to be believed," and (2) show that "appellant was not the kind of person who would sexually abuse young boys." The State asserts that "[a]t the close of appellant's case, he had (1) secured admissions from [the complainant] that he had told a number of people he lied about what appellant had done to him, (2) introduced a great deal of testimony that [the complainant] was not a truthful individual, and (3) sought to establish that he was the sort of man that had normal dating relationships with women and who therefore would not approach teenage boys." The State contends that because its evidence that appellant had sexually abused two other boys "rebutted appellant's suggestion that he was not the sort of person that would commit the charged offense," the evidence "had relevance apart from character conformity and was admissible."

The extraneous offense testimony of K.S. and C.R. was not admissible to bolster the impeached testimony of the complainant. Thus, the issue squarely presented to this Court, and actually argued by the State itself, is whether the extraneous offense testimony of K.S. and C.R. was admissible to rebut any false impression-inferences created by the testimony of appellant's witnesses that appellant "was not the sort of person that would commit the charged offense."

It must be emphasized that the State, in its briefing to this Court, does not in any way contend that the extraneous offense testimony of K.S. and C.R. was admissible to rebut any defensive theory that "appellant lacked the intent to commit the offense" or that appellant was "the victim of a frame up by Melvina Stepherson." In fact, the State, again in stark contrast to

the majority, makes no attempt at all in its briefing to this Court to argue that the extraneous offenses are in any way similar to the offense charged in the instant case.

### Pertinent Testimony

In the State's case-in-chief, the complainant, a 13–year–old boy at the time of trial, testified that he had known appellant for almost his entire life and that he and his cousins, Glen and Fred Stepherson, would go to appellant's house to watch movies and to play. On several different occasions, starting when he was around eight or nine years old, the complainant received permission from his grandmother, Melvina Stepherson, to spend the night at appellant's house. The complainant slept in the same bed as appellant, and, one night, appellant woke the complainant to tell him that the complainant had wet the bed. After the complainant went to the bathroom to change clothing, appellant told him that he could either "get a whipping or take [his] clothes off." The complainant told appellant that he would rather receive a whipping. After appellant struck him on the buttocks with a belt, the complainant, not wanting to be struck again, took off his clothes. Appellant then told the complainant to get some baby oil from the bathroom, and when the complainant returned, appellant was naked and told him to "rub [appellant] down with baby oil." The complainant rubbed the oil on appellant's chest, penis, and buttocks, and appellant rubbed the complainant's penis and buttocks with baby oil. Appellant told the complainant not to tell anyone what had happened, and, because the complainant was scared, he did not tell anyone what had occurred.

On eight or nine different occasions, appellant took the complainant for a ride in appellant's car and gave the complainant alcoholic beverages to drink, which made the complainant feel dizzy and drowsy. Appellant told the complainant to remove his clothes, and appellant then pulled down his own pants and told the complainant to rub appellant's penis. At the same time, appellant would rub the complainant's penis with one hand and would drive the car with the other hand.

The complainant further testified that, on at least five or six other occasions when they were at a recording studio, appellant took him to a back room, which had "some kind of fuzz" on the walls, and told the complainant to take off his clothes. Appellant removed his own clothes and instructed the complainant to rub appellant's penis as appellant rubbed the complainant's penis.

Over appellant's objections, the State, while still presenting its case-in-chief, elicited testimony from the complainant that one week prior to trial, he was at the house of Jeneko Vincent, who was the friend of Glen and Fred. While there, Vincent, Glen, Fred, and Eldrick Telfar, another friend, forced the complainant to make a videotape, in which he stated that the allegations that he had made against appellant were not true and that he was "just jealous of [his] cousins Glen and Fred because they were getting a lot of things from [appellant]." Later at Telfar's house, they made the complainant write a letter, in which he stated that his uncle told him to make the allegations against appellant. The complainant explained that the four boys told him that they would pay him money to write the letter but that he did not want their money. The complainant stated that he made the tape and wrote the letter because the boys told him that the allegations against appellant would be in the news and that the complainant would not have any friends if he did not retract his allegations against appellant.

Melvina Stepherson testified that she has raised the complainant since he was 11 months old because his mother was not a good mother to him. She explained that she was acquainted with appellant because he was a cousin of two of her granddaughters. She noted that appellant once bought tennis shoes for the complainant but that she did not think that such a purchase was odd because appellant "always bought things for [her] grandchildren." She also noted that appellant would take the complainant out to eat, to the movies, and to appellant's house to spend the night. Stepherson explained that, when the complainant was eight or nine years old, he first made allegations against appellant, but that she did not do anything about it because, at that time, she had just had a stroke and could not drive him anywhere.

Toward the beginning of its direct examination of Stepherson, the State, again while presenting its case-in-chief, asked her, "Now, as long as you have known ... [appellant], have you ever known him to have a girlfriend?" Stepherson answered, "No." Under appellant's cross-examination, she testified that appellant had coached a football team, but that the complainant had not played on that team. She stated that two of her grandsons, Glen and Fred, had lived with appellant for about two years and that appellant had taken care of them. On re-direct examination, she testified that appellant's football league was one in which "he got young boys to come and play on his football team." She further testified that appellant was usually in the company of boys and men and that appellant bought Glen and Fred expensive items.

In his defense, appellant called Britney Paley, one of the complainant's cousins. Paley testified that, in her opinion, the complainant is not a truthful person. She stated that, approximately one year before the trial began, the complainant told her that the allegations he asserted against appellant were not true and that he made them up because appellant was mean. He also told Paley that he did not like appellant because appellant "didn't do anything for him" and showed favoritism. She also stated that the complainant called her one week before the trial began and again told her that the complainant's allegations against appellant were false. On both direct and cross-examination, Paley also testified that she had known appellant to have had many girlfriends.

Eldrick Telfar testified that the complainant voluntarily made the videotape and wrote the letter in which the complainant admitted that his allegations against appellant were false. On cross-examination, Telfar admitted that appellant had previously bought him clothes and shoes and had taken him to the mall and the recording studio.

Glen Stepherson testified that, in his opinion, the complainant was not a truthful person and that the complainant made the videotape and wrote the letter voluntarily. He explained that the complainant told him that he made the videotape and wrote the letter to help appellant because the allegations were not true. Glen also testified that appellant had helped to raise him, that appellant had done a good job doing so, and that appellant had had a number of girlfriends over the years.

Appellant also presented the testimony of Jason Thomas, Jeneko Vincent, Brooke Austin, and Virginia Blackwell. Thomas, a friend of Glen, testified that he did not believe that the complainant was a truthful person and that the complainant told Thomas that he wrote the letter because he was sorry for lying and that he wanted appellant to be released from jail. Thomas also testified that his sister had dated

appellant for a short time and that his sister had tattooed appellant's nickname, "Pookie," on her leg. Vincent testified that, in his opinion, the complainant was not a truthful person and that the complainant told him that he made the videotape because he made the allegations against appellant out of jealousy. Austin testified that, two months before trial began, the complainant told her that appellant had never touched him, that, in her opinion, the complainant was not a truthful person, and that appellant had had many girlfriends. Blackwell, appellant's mother, testified that appellant had had many girlfriends over the years.

In its rebuttal, the State then presented the testimony of K.S., a 16–year–old boy at the time of trial, and C.R., a 15–year–old boy at the time of trial. K.S. testified that, when he was 13 years old, he had sung in a three-boy group and had made an appointment to record music at appellant's studio. K.S. and two friends went to the studio a few times to listen to other people record music, and, on about the seventh visit, appellant, whom K.S. knew as "Trey Black," told K.S. that he wanted K.S. to sing individually in a soundproof room, while the other two boys waited in a room next door. Appellant told K.S. that K.S. was not singing loudly enough and that if K.S. "jacked off or bust[ed] a nut, it would make [him] sing louder." Appellant told him to remove his clothes, and K.S. eventually complied because he thought that appellant would not allow him to leave unless he did so. Appellant then rubbed K.S.'s stomach and told him to masturbate, but K.S. refused. After a while, appellant let K.S. put his clothes back on and leave. When K.S. got home, he told his mother what appellant had done, and his mother reported the incident to the police department.

C.R. testified that he knew the complainant because they used to live on the same street. On one occasion, when C.R. was 12 years old, appellant, whom C.R. knew as "Pookie Trey," drove both the complainant and C.R. to the movies. Afterward, on the way back to their homes, appellant claimed that he was sick and stopped at his apartment. Because the complainant appeared to be asleep in the back seat, appellant told C.R. to go inside the apartment with him. Appellant went upstairs, while C.R. played a video game downstairs. Later, appellant called C.R. upstairs and told him that C.R. "needed to become a man." They entered appellant's bedroom, where a inflatable sex doll was lying on the floor. Appellant told C.R. that C.R. could not leave until he "fuck[ed] the doll." Appellant told C.R. to take off his clothes and have sex with the doll until C.R. "nutted." Appellant videotaped C.R. having sex with the doll, and when C.R. was finished, appellant told C.R. that C.R. "was a man now."

### Extraneous Offense Evidence

A trial court's admission of extraneous offense evidence is reviewed for an abuse of discretion. *Rankin v. State,* 974 S.W.2d 707, 718 (Tex.Crim.App.1996); *Wolfberg v. State,* 73 S.W.3d 441, 443 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd). As long as a trial court's decision to admit evidence is within the "zone of reasonable disagreement," there can be no abuse of discretion. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1990).

Texas Rule of Evidence 404(b) embodies the well-established principle that an accused may be tried only for the offense for which he is charged and not for criminal propensities. Tex.R. Evid. 404(b); *Owens v. State,* 827 S.W.2d 911, 914 (Tex.Crim. App.1992). Consequently, extraneous offenses are not admissible at the guilt

phase of a trial to prove that a defendant acted in conformity with his character in committing an offense. TEX.R. EVID. 404(b). An extraneous offense, however, has noncharacter-conformity relevance when it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Powell v. State,* 63 S.W.3d 435, 438 (Tex.Crim.App.2001). In other words, extraneous offense evidence that tends to make an elemental or evidentiary fact more or less probable or tends to rebut some defensive theory is relevant beyond its tendency to prove a person's character or that he acted in conformity therewith. *Rankin,* 974 S.W.2d at 718; *Montgomery,* 810 S.W.2d at 386–87. Consequently, evidence of other crimes or extraneous misconduct may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident. TEX.R. EVID. 404(b). These exceptions and others drawn from case law are neither exclusive nor exhaustive. *Pondexter v. State,* 942 S.W.2d 577, 583–84 (Tex. Crim.App.1996). Such extraneous offense evidence may be relevant and admissible to rebut a defensive theory. *Ransom v. State,* 920 S.W.2d 288, 301 (Tex.Crim.App. 1994); *Powell,* 63 S.W.3d at 439; *Roberts v. State,* 29 S.W.3d 596, 601 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd).

However, contrary to the majority's analysis and conclusions, the State does not contend that the rebuttal testimony of K.S. and C.R. was admissible to prove motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident. Rather, the State argues that the testimony of K.S. and C.R. "had relevance apart from character conformity and was admissible" because "[w]hen the State introduced evidence [that appellant] had sexually abused two other teenage boys, it rebutted [his] suggestion that he was not

the type of person that would commit the charged offense." The State notes that many of appellant's witnesses testified that appellant had had many girlfriends over the years. It asserts that "[t]he point of introducing claims that appellant had had many girlfriends over the course of his life was to suggest to the jury that he was not the sort of person to be sexually interested in young boys." The trial court explained its reasoning for admitting the rebuttal testimony as follows:

> I think—and for the Appellate Court, generally it would be my view that this sort of thing should not come in; but it just seems to me that the impression in front of the jury is just so unfair if I don't allow the State to rebut it. So, it's just—I guess it gets down to a basic sense of fair play, and these rules are intended to give everybody a fair trial; the State as well as the Defense. So, I'm clearly not setting any precedent here because this is a very unique set of circumstances; but I am going to allow the State to go into it.

In regard to the rebuttal of such "false impressions," the Texas Court of Criminal Appeals has explained that, when a witness presents a picture that an accused is not the type of person to commit a certain type of offense, the State "may impeach that witness's testimony by cross-examining the witness concerning similar extraneous offenses." *Wheeler v. State,* 67 S.W.3d 879, 885 (Tex.Crim.App.2002). However, as emphasized by the Court, "[t]he evidentiary caveat . . . is that the opponent must correct the 'false impression' through cross-examination of the witness who left the false impression, *not* by calling other witnesses to correct that false impression." *Id.* Moreover, "[a]s a general rule, the defensive theory that the State wishes to rebut through the use of extraneous offense evidence must be elicited on direct

examination by the defense and may not by elicited by 'prompting or maneuvering' by the State." *Id.; see also Shipman v. State,* 604 S.W.2d 182, 185 (Tex.Crim.App. 1980).

In the instant case, it was the State, not appellant, that placed appellant's sexual interest in women at issue. Although the State asserts that appellant introduced evidence that he had had many girlfriends to suggest that "he was not the sort of person to be sexually interested young boys," the State, in its case-in-chief, asked Melvina Stepherson, "Now, as long as you have known ... [appellant], have you ever known him to have a girlfriend?" Stepherson answered, "No." It is well-settled that the State "may not rely on its own questioning" to get into collateral matters and extraneous offenses and bad acts "which would otherwise be inadmissible." *Shipman,* 604 S.W.2d at 185. Although many of appellant's witnesses did testify that he had had many girlfriends over the years, it was the State that prompted the issue by eliciting Stepherson's contrary observation in its case-in-chief, apparently to suggest to the jury that appellant was not the sort of person to be sexually interested in women.

Even assuming that appellant, by eliciting testimony that he in fact had had girlfriends in the past, somehow raised the defensive theory that he was not the type of person to sexually abuse young boys, the State would only have been "entitled to rebut that 'false impression' inference with *cross-examination questions* [of appellant's witnesses] concerning allegations of similar misconduct toward another child." *Wheeler,* 67 S.W.3d at 885–86. Here, however, the State did not attempt to correct any false impression by cross-examination of the witnesses who left the false impression. Rather, the State attempted to correct the false impression through the direct testimony of two other witnesses, K.S. and C.R., in its rebuttal case.

Moreover, K.S.'s allegation that appellant rubbed K.S.'s stomach and told him to masturbate and C.R.'s allegation that appellant insisted that he have sex with a doll are not allegations of misconduct similar to the complainant's allegations in the instant case, i.e., that of mutual masturbation.

In sum, the State relied on its own questioning of Melvina Stepherson to get into the extraneous offense testimony of K.S. and C.R. Moreover, regardless of which side actually placed appellant's sexual interest in women at issue, the State would only have been entitled to rebut any false impression inferences through cross-examination of the pertinent witness about allegations of similar misconduct toward other children. Here, the State presented testimony from other witnesses about allegations that were not similar to the complainant's allegations. Accordingly, this Court should hold that the trial court erred in admitting the extraneous offense testimony of K.S. and C.R.

### Harm Analysis

A trial court's error in admitting evidence is generally non-constitutional error. *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998); *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997). Accordingly, it must be determined whether the error affected appellant's substantial rights and, if not, the error must be disregarded. Tex.R.App. P. 44.2(b). A substantial right is affected where the error had a substantial injurious effect or influence in determining the jury's verdict. *King,* 953 S.W.2d at 271. A conviction due to non-constitutional error will not be overturned on appeal if, after examining the entire record, the appellate court has fair assurance that the error did not influence the jury, or its effect was slight. *Reese v.*

*State,* 33 S.W.3d 238, 243 (Tex.Crim.App. 2000). In conducting its analysis, an appellate court considers the nature of the evidence that supports the verdict, the character of the alleged error, and how the jury might consider it in connection with other evidence. *Bagheri v. State,* 119 S.W.3d 755, 763 (Tex.Crim.App.2003). Additional considerations include jury instructions, the State's theory of the case, the defense's theory of the case, closing arguments, voir dire, and whether the State emphasized the error. *Motilla v. State,* 78 S.W.3d 352, 355–56 (Tex.Crim. App.2002). Finally, the presence of overwhelming evidence of guilt may also be considered. *Id.* at 357.

The State's rebuttal testimony of K.S. and C.R. undoubtedly had more than a slight effect upon the jury's decision. In all, 16 witnesses testified over a four-day period in the guilt phase of the trial. Seven of those testified for the State in either its case-in-chief or rebuttal, and nine of those testified for appellant. Because there was no physical or otherwise corroborative evidence, the outcome of the trial depended solely upon whether the jury believed the complainant. A large portion of the closing arguments, both appellant's and the State's, was spent on discussing the credibility of the witnesses. In fact, although the trial court instructed the jury that it could only consider the testimony of K.S. and C.R. "in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant," the State expressly argued that their testimony was presented "for the purpose of rebutting" the evidence presented by appellant that he was "a good guy" and that the complainant was "a liar."

After reviewing the entire record, it cannot be said that the impact of the testimony of K.S. and C.R. did not significantly impact the jury's verdict because it was presented to improperly bolster the State's case. *See Webb v. State,* 36 S.W.3d 164, 183 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (en banc) (holding that erroneous admission of extraneous sexual assault of third party was harmful where complainant and appellant were only witnesses to offense). Moreover, it cannot be said with fair assurance that the erroneous admission of the testimony of K.S. and C.R. did not influence the jury or that its admission did not affect appellant's substantial rights. Accordingly, this Court should hold that the erroneous admission of the extraneous offense testimony of K.S. and C.R. resulted in reversible error.

### Conclusion

Because the trial court reversibly erred in admitting the extraneous offense testimony of K.S. and C.R. into evidence, this Court should sustain appellant's first issue, reverse the judgment of the trial court, and remand this cause to the trial court for a new trial.