**Opinion issued August 30, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

**NO. 01-10-00901-CR**

—————————————

**TIMOTHY RYAN RICHERT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 185th Judicial District Court**
**Harris County, Texas**
**Trial Court Case No. 1262576**

---

**MEMORANDUM OPINION**

A jury found appellant, Timothy Ryan Richert, guilty of the offense of continuous sexual abuse of a young child,[1] and the trial court assessed his

---

[1] *See* TEX. PENAL CODE ANN. § 21.02 (Vernon 2011).

punishment at confinement for life.  In eight issues, appellant contends that the evidence is legally insufficient to support his conviction and the trial court erred in denying his motion to suppress evidence and admitting other evidence.

We affirm.

## Background

At a pretrial hearing on appellant's motion to suppress evidence, Houston Police Department ("HPD") Officer G. Garcia testified that in April 2009, he was assigned to investigate allegations that appellant had sexually abused the complainant, his daughter.  After interviewing several witnesses and reviewing the evidence, Garza obtained a warrant to arrest appellant.  While attempting to locate appellant, Garza spoke with Jennifer Richert, appellant's ex-wife and the mother of the complainant.  She informed Garza that appellant "had possession of weapons and perhaps videos" and "had mentioned in the past that if police ever came looking for him, that he would hide in his attic and possibly take all those items with him."

HPD Sergeant R. Haney testified that he, along with several other police officers, was assigned to arrest appellant at his house.  Upon arrival, Haney saw a red truck in the driveway and checked the license plate number on his computer, which revealed that the truck belonged to appellant.  Haney knocked on appellant's door several times and, after receiving no response, dialed appellant's home

2

telephone number. He could hear the telephone "ringing inside the house," but the individual who answered the telephone ended the call when Haney announced that the officers were there to enforce an arrest warrant. Haney noted that the officers "could hear stumbling around inside the house," followed by a "loud thump" before "it went quiet." Officer Garza had informed him that appellant was possibly "going to run and . . . hide somewhere in the house up in the attic."

Sergeant Haney then proceeded to breach the front door, and he heard "thumping" in the attic. During a brief protective sweep of the house, the officers discovered two empty firearm holsters. They then pulled down the attic door, which had folding-trim attached to it. Haney noticed a rope that was attached to the inside of the door so that "somebody that's up in the attic [could] grab that rope and . . . close the attic door behind them." The officers, suspecting that appellant was in the attic, instructed him to come down from the attic, but they received no reply. Haney considered going up into the attic to be "extremely unsafe" because it was dark and an "unknown area that . . . the suspect knows very well." The officers, suspecting that appellant was armed, used a mirror to look into the attic. The attic was mostly bare with the exception of a chimney and an air conditioning unit, both of which obstructed the officers' view. After 30 or 40 minutes of attempting to compel appellant to exit the attic, the officers contacted a canine unit to come to the house and search the attic. As the dog ascended the attic stairs,

3

Haney shouted "that a canine's about to be deployed," at which point appellant stood up from behind the air conditioning unit and said, "I'm coming out, I'm coming out, don't hurt me, please don't hurt me."

The officers arrested appellant when he exited the attic, and they ascended into the attic "to clear that area [and] to make sure that there's no victims" or "other bodies." The officers focused on the areas behind the chimney and behind the air conditioning unit because they could not see those areas using the mirror at the base of the attic stairs. Although most of the attic was covered in dust, Officer Haney noticed a "trail of footprints" leading to the rear of the air conditioning unit, where the dust was "disturbed around a pretty large area" as if "someone had been [lying] down." Haney, wanting to investigate the area "where [appellant] was secluding himself" for "the possible weapon that [the officers] found the empty holster to," looked behind the air conditioning unit, where he saw "a plank that was pulled up and shifted aside a few inches" with a "white plastic bag . . . coming out from underneath that plank." The bag was open, and Haney saw "three-and-a-half-inch flopp[y computer disks], . . . some 8 millimeter tapes, and . . . a VCR tape." Haney, who had learned from his training in investigating child-abuse cases that offenders typically keep "video or digital evidence" of their crimes as "souvenirs," believed that the items constituted "evidence of some kind of illegal" activity, and

4

he seized the items. After seizing the items, Haney noticed that the tapes had female names and sexual acts written on them.

The trial court found that the police officers had discovered the disks and tapes "in plain view" and they had information that appellant could be in possession of videos depicting criminal acts. It then denied appellant's motion to suppress evidence.

At trial, the complainant testified that appellant began sexually abusing her when she was about five years old and her parents were divorced. She would visit appellant with her older brother and younger sister on weekends. Appellant would tell the complainant to sleep in his bed, take her to his bedroom, remove her clothes, and "stick his finger" in her "tinkler." Appellant would occasionally play pornographic movies on a television during the abuse, which occurred "a lot of times" and "almost every night" that the complainant visited appellant at his house. Appellant also performed oral sex on her and, on at least one occasion, he instructed her to touch his "tinkler" with her tongue until "white stuff came out," which he explained was "medicine." The complainant was seven years old when appellant last abused her sexually. She explained that she did not tell anyone about the abuse immediately because appellant had said, "If you tell . . . something bad's going to happen." The complainant eventually told her mother and grandmother

5

about the abuse because her younger sister had spoken of similar allegations, "didn't get in trouble," and "nothing bad happened to her."

Margaret Ann Williams, Jennifer's mother and the complainant's grandmother, testified that at the time of the complainant's birth, Jennifer's marriage to appellant was "rocky," and she filed for divorce in 2002. Around this time, elementary school students had accused appellant of child abuse in his capacity as a teacher in the Houston Independent School District ("HISD"). In 2005, the complainant began attending a preschool that was directed by Williams, and, at some point, a teacher informed Williams that the complainant was touching her "vaginal area" while the class was watching a movie. When Williams told the complainant not to "touch down there," the complainant responded that, "Daddy does, Daddy tickles me." Williams reported the incident to Child Protective Services ("CPS"), which sent an investigator to interview the complainant for about 15 minutes. At this time, the complainant did not disclose any abuse to the investigators.

In 2009, when Williams was bathing the complainant and her younger sister, the younger sister mentioned something that made Williams "freak out" and led her to believe that her grandchildren were being "touched again." When the girls got out of the bathtub, Williams noticed irritation in both of their genital areas. Williams told Jennifer about her concerns, but she did not immediately inform CPS

6

because she was frustrated by CPS's earlier investigation and afraid that appellant would get custody of her grandchildren. Instead, Williams and Jennifer instructed the younger sister to tell "some person that would listen." The next day, Williams received a telephone call from a teacher expressing concern about an incident between the younger sister and appellant. The outcry to the teacher eventually led to appellant being charged with sexually abusing the younger sister. After this incident, Williams noticed that the complainant "had a little bit more aggression . . . or anger in her" and acted "withdrawn." A year later, the complainant informed Jennifer and Williams of an incident that resulted in Williams's notification of CPS.

The younger sister testified that, when she was 4 or 5 years old, appellant started to "stick his finger up [her] private spots" during visits. He would enter the children's bedroom, tell her to come with him back to his bedroom, and remove her clothing. Sometimes he would turn on the television to a "disgusting show" depicting "grown-ups doing it to other grown-ups." This abuse occurred "many times" over several visits. She explained that she did not tell anyone immediately because appellant had told her that a "judge would get mad at me and somebody would get in jail."

A female elementary school student, who was in a class taught by appellant, testified that in 2001, appellant would play movies for the class. He would then

7

invite some students, including the young girl, to sit on his lap, "take a blanket from the cabinet," cover the students with the blanket, rub the students' stomachs, and unbutton their pants. He would then slide his hand underneath the young girl's pants and insert his finger into her vagina. She conferred with other girls in the bathroom and asked, "What should we do?" Eventually, appellant announced to the class that he "wasn't allowed to have students sit on his lap anymore." However, he continued to invite students to sit on his lap while showing movies. Later that year, appellant met with the young girl, her mother, and the school principal. He admitted to "rubbing [her] on the back and the lower part of [her] back." The young girl's mother reported appellant to law enforcement authorities, and she initiated a civil lawsuit which resulted in a settlement, awarding the young girl a "lump sum" of money from HISD to be received on her 18th birthday.

Jennifer Richert testified that she met appellant in 1996 and married him three years later. Appellant would describe his position in the relationship as "dominant" and hers as "subservient." After the birth of their son, appellant would ask Jennifer "odd questions," such as, "Would you still love me if I had sexual feelings towards any daughters that we might have?" Jennifer believed that these questions were a "test" of the "depth of [her] love" for appellant. Appellant would also ask Jennifer to act out various sexual "fantasies," including a scenario in which Jennifer was a "make-believe victim in [a] rape scene" and a

8

"father/daughter fantasy" in which appellant would prompt Jennifer to say, "stop, Daddy." Jennifer explained that the "father/daughter fantasy" was appellant's "favorite."

In 2001, after Jennifer became pregnant with the complainant, she learned of the allegations that appellant had abused his students while a teacher. The allegations and the birth of a new child "strained" their marriage further. To her knowledge, the allegations ended in a settlement with HISD, but no criminal charges were filed against appellant. After Jennifer and appellant had decided on the complainant's name, appellant began to use her name while enacting his "fantasies," which disturbed Jennifer. The night before Jennifer gave birth to the complainant, appellant videotaped him and Jennifer acting out the "father/daughter fantasy," during which appellant made several sexually explicit comments about his unborn daughter. A redacted version of the videotape, which was one of the videotapes recovered from appellant's attic by Officers Garza and Haney, was then admitted into evidence and played for the jury.

Jennifer separated from appellant in early 2002, but he returned to her house after Jennifer found out that she was pregnant with their third child, the complainant's younger sister. One month later, however, Jennifer left the house and filed for divorce, seeking sole custody of the children with supervised visitation for appellant because of her "fears with HISD and [her] fears for the

9

fantasies." Appellant sought sole custody based on "alienation of affection." However, after HISD's settlement of the civil lawsuit, Jennifer agreed to joint custody of the children, believing that she had "absolutely no physical evidence to support my claim or . . . my fears."

In 2005, when the complainant was 3 years old, she told Williams that "Daddy was touching her tinkler." Jennifer immediately informed CPS, but the complainant did not reveal any abuse to the CPS investigator, and the case was "dropped." After hearing that she had notified CPS of the allegation, appellant threatened that the call was "grounds for parental alienation and he would sue for full custody." In 2009, Jennifer visited her parent's house to pick up her children, and Williams called the younger sister in the room. She told Jennifer that "Daddy was touching her on her tinkler." Jennifer was afraid to immediately report the incident to CPS because of appellant's threat to sue for sole custody of the children based on parental alienation. Instead, she hoped that the younger sister "would tell her teacher at school because . . . a call [to] CPS coming from an educator . . . would carry more weight." So, Jennifer told the younger sister "to tell the truth to [her] teacher." The next day, she received a telephone call from the school concerning the younger sister's communications with her teacher. Jennifer asked her mother to take the girl to visit a doctor. As a result, appellant was eventually arrested for the sexual abuse of the younger sister, and Jennifer obtained a

protective order, requiring that appellant not contact Jennifer or her children. After the younger sister's outcry, the complainant started acting more "withdrawn," and, in 2010, the complainant told Jennifer that "Daddy touches [her] on the tinkler . . . [a]nd . . . with his tongue and that's disgusting." She also told Jennifer that during the abuse "there would be people on [the television] doing the same thing," and Jennifer informed CPS of the complainant's allegation that night.

## Sufficiency of the Evidence

In his first issue, appellant argues that the evidence is legally insufficient to support his conviction because the complainant was the "only individual testifying about the specific allegations" and her testimony did not establish that "appellant's conduct involved two or more acts of sexual abuse during a period that was 30 days or more in duration."

We review the legal sufficiency of the evidence "by considering all of the evidence in the light most favorable to the prosecution" to determine whether any "rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly

11

resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

A person commits the offense of continuous sexual abuse of a child if, during a period that is 30 or more days in duration, he commits two or more acts of sexual abuse, and, at the time of the commission of each of the acts, the offender is 17 years of age or older and the complainant is a child younger than 14 years of age. TEX. PENAL CODE ANN. § 21.02(b)(1), (2) (Vernon Supp. 2011). An "act of sexual abuse" includes sexual assault, aggravated sexual assault, sexual performance by a child, and indecency with a child other than by touching the breast of a child. *Id.* § 21.02(c). A jury is "not required to agree unanimously on which specific acts of sexual abuse were committed" or "the exact date when those acts were committed," but only that "the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse." *Id.* § 21.02(d). A person commits the offense of aggravated sexual assault of a child if the person intentionally or knowingly causes the penetration of the anus or sexual organ of the child by any means. *Id.* § 22.021(a)(1)(B)(i) (Vernon Supp. 2011).

Here, the complainant testified that appellant inserted his finger into her vagina, which itself satisfies the elements of aggravated sexual assault of a child. *See id.* She testified that this abuse happened "almost every night" that she visited appellant's house, it started when was almost 6 years old, and it continued until she was the age of 7. And Jennifer Richert testified that the complainant would visit appellant once every two weeks during the two-year pendency of the divorce proceedings. The testimony of a complainant standing alone, even when the complainant is a child, is sufficient to support a conviction for sexual assault. *Carty v. State*, 178 S.W.3d 297, 303 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *Ruiz v. State*, 891 S.W.2d 302, 304 (Tex. App.—San Antonio, pet. ref'd). Thus, the jury could have reasonably found, from the complainant's testimony regarding the abuse and Jennifer's testimony regarding the visitation schedule of her visits to appellant, that appellant committed two or more acts of aggravated sexual assault of a child over a period of 30 or more days. *See* TEX. PENAL CODE ANN. § 21.02(b)(1), (2). Furthermore, the State also presented the testimony of an outcry witness, Williams, who corroborated the complainant's account of the sexual abuse. Considering the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the elements of the offense of continuous sexual abuse of a child beyond a reasonable doubt.

13

*See Moreno*, 755 S.W.2d at 867.  Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction.

We overrule appellant's first issue.

**Motion to Suppress Evidence**

In his second and third issues, appellant argues that the trial court erred in denying his motion to suppress the evidence seized from his attic because both the search of his attic and the seizure of the evidence was done in violation of the Fourth Amendment of the United States Constitution[2] and Article I, Section 9 of the Texas Constitution.[3]

We review a ruling on a motion to suppress evidence for an abuse of discretion.  *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008).  We generally consider only the evidence adduced at the suppression hearing unless the parties consensually re-litigate the issue at trial, in which case we also consider relevant trial testimony.  *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996).  We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and we review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor.  *Neal v. State*, 256 S.W.3d 264, 281

---

[2]     *See* U.S. CONST. amend. IV.

[3]     *See* TEX. CONST. art. 1, § 9.

(Tex. Crim. App. 2008). At a suppression hearing, a trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, a trial court may choose to believe or to disbelieve all or any part of a witnesses' testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

*Search of the Attic*

Under the Fourth Amendment, a search conducted without a warrant issued upon probable cause is *per se* unreasonable unless one of a few well-delineated exceptions applies. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043 (1973). One exception to the necessity of a search warrant is a "protective sweep" performed by police officers. *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094–95 (1990). A "protective sweep" is a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of the police officers or others." *Id.* "It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* As an incident to arrest, police officers may lawfully, "as a precautionary matter and without probable cause or suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334, 110 S. Ct. at 1098. "Beyond that, however, . . . there must be articulable facts which, taken together with the rational inferences from those facts, would warrant

15

a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

Appellant argues that the warrantless search of his attic cannot be justified under the protective-sweep exception because Officer Haney "did not articulate any reasonable suspicion that the attic area harbored any individual posing a threat to those on the arrest scene." However, under the standard articulated in *Buie*, police officers may lawfully conduct a protective sweep of those areas "immediately adjoining the place of arrest" even "without probable cause or suspicion." *Id.* For example, in *United States v. Charles*, the defendant challenged the constitutionality of a search of his storage unit. 469 F.3d 402, 404 (5th Cir. 2006). Police officers suspected the defendant of dealing in narcotics and saw him transporting envelopes from the storage unit back to his car. *Id.* The officers arrested the defendant while he "was standing between the left wall of the storage unit" and his car. *Id.* After arresting the defendant, the officers entered the storage unit and discovered a "partially disassembled firearm on top of a cardboard box in the corner of the storage unit." *Id.* The defendant argued that because "the officers on the scene could have had no 'reasonable suspicion' that any other individuals were present in the storage unit, a protective sweep [of the storage unit] was not justified." *Id.* at 405. The court held that, under *Buie*, the cursory sweep of the storage unit "immediately adjacent to the site of arrest was permissible, even

16

without probable cause or reasonable suspicion." *Id.* at 406. Because the defendant was arrested "just at the entrance to the open storage unit," the court held that the officer's entrance into the storage unit was part of a lawful protective sweep. *Id.* at 405–06; *see also United States v. Mata*, 517 F.3d 279, 285 (5th Cir. 2008) (stating that police officers could search areas "immediately adjoining" the place of arrest without probable cause or reasonable suspicion, but "cursory 'protective sweeps' of larger areas" require "articulable facts . . . that allow a reasonable officer to suspect that an individual dangerous to the officers is within the area to be searched").

Here, Officer Garza testified that Jennifer had told him that appellant "had possession of weapons and videos" and "had mentioned . . . that if police ever came looking for him, . . . he would hide in his attic and possibly take all those items with him." More important, Officer Haney testified that the officers arrested appellant at the bottom of the attic stairs, after appellant had been hiding in the attic for 30 to 40 minutes. Although the officers could see into most of the attic by using a mirror, the attic was dark and the officers could not see behind the chimney or the air conditioning unit. Haney then entered the attic, an area "immediately adjoining" the place of arrest at the bottom of the attic stairs, to "make sure there's no victims, no people, . . . no other bodies that are inside the structure." He was also concerned about the possibility of a firearm because the officers had found

17

two empty gun holsters during their previous sweep of the house. Haney specifically checked behind the chimney and behind the air conditioning unit, and he noted that these were the only "places that someone would be able to hide in there." He explained that the air conditioning unit was "long and broad" and there was a "pretty large area back behind the air conditioning unit" where someone could hide.

In support of his argument that the search of the attic was unlawful, appellant relies on *Reasor v. State*, 12 S.W.3d 813 (Tex. Crim. App. 2000) and *Davis v. State*, 74 S.W.3d 90 (Tex. App.—Waco 2002, no pet.). In *Reasor*, police officers arrested the defendant in the driveway in front of his house. 12 S.W.3d at 815. After the arrest, the officers then entered the defendant's house to conduct a "protective sweep" of the entire house. *Id.* The court held that the officers could only "sweep the house" if they possessed a reasonable belief that a person in the area posed a danger to the officers or to other people. *Id.* at 817. Similarly, in *Davis v. State*, police officers arrested a defendant outside of his trailer and then entered the trailer, finding a methamphetamine lab in the kitchen. 74 S.W.3d at 96–97. The court held that the officers had no reasonable suspicion of danger coming from within the trailer, and it specifically noted that the defendant was arrested outside the trailer. *Id.* Here, in contrast, the police officers conducted a search of the attic in which appellant had been hiding before his surrender and after

18

the officers had already lawfully entered the house to arrest appellant. Unlike in *Reasor* and *Davis*, the officers here limited their search to an area occupied by appellant and immediately adjoining the place of the arrest.

In support of his argument that the police officers' specific search behind the air conditioning unit was unlawful, appellant relies on *Radford v. State*, No. 05-01-00092-CR, 2002 WL 169665 (Tex. App.—Dallas Feb. 4, 2002, no pet.) (not designated for publication). In *Radford*, the court held that, during an otherwise lawful protective sweep, the officers could not have lawfully searched a defendant's freezer and seized marijuana found within because there were no facts indicating that the freezer contained contraband and "the freezer compartment was not large enough to hold a person." *Id.* at *5. Here, Officer Haney testified that the area behind the air conditioning unit was large enough that a person could hide behind it. Accordingly, we hold that, under the facts of this case, the search of the attic and the area behind the air conditioning unit constituted a lawful protective sweep.

### Seizure of the Evidence

A police officer may lawfully seize an item in "plain view" if he (1) is legally present when he sees the item and (2) "immediately recognizes" the item as evidence such that he has probable cause to "associate the item with criminal activity." *Ramos v. State*, 934 S.W.2d 358, 365 (Tex. Crim. App. 1996). To

19

"immediately recognize" an item as evidence of criminal activity, a police officer need not have actual knowledge that the item is contraband, but he must have "probable cause to associate the [item] with criminal activity." *Texas v. Brown*, 460 U.S. 730, 741–42, 103 S. Ct. at 1543; *Joseph v. State*, 807 S.W.2d 303, 308 (Tex. Crim. App. 1991). It only requires a practical, nontechnical probability that incriminating evidence is involved. *Brown*, 460 U.S. at 736–42, 103 S. Ct. at 1540–43. A police officer may use his training and experience in determining whether an item in plain view is contraband. *Id.* at 746, 103 S. Ct. at 1545 (Powell, J., concurring) (citing *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 695 (1981)); *Joseph,* 807 S.W.2d at 308.

As we noted above, the officers lawfully performed a protective sweep of the attic. Thus, the officers were "legally present" in the attic when they saw the floppy computer disks, 8-millimieter tapes, and the videotape. *See Ramos*, 934 S.W.3d at 365. Appellant argues that the officers could not "immediately recognize" the videotape as evidence of criminal activity without first opening the bag. However, Officer Haney testified that the bag was already open and he could "see down . . . into [the] white bag . . . without touching anything and just looking." As we give almost total deference to the trial court's determination of historical facts and the witnesses' credibility, the trial court was entitled to believe

Haney's testimony that the bag was open when he found it. *See Neal*, 256 S.W.3d at 281.

Appellant next asserts that, even if the officers did not open the bag containing the evidence, "probable cause was not established that the contents were uniquely associated with criminal activity." At the pretrial hearing on appellant's motion to suppress evidence, the State relied on *Braggs v. State*, 951 S.W.2d 877 (Tex. App.—Texarkana 1997, pet. ref'd). In *Braggs*, a police officer entered the home of the defendant, who had been indicted for robbery, to arrest him. *Id.* at 880. The officer knew that "several gold watches had been taken in the robbery," and, seeing a gold watch on the defendant's dresser, he "took the watch in order to determine it [had been] stolen." *Id.* The court concluded that because the officer knew that gold watches had been stolen in the robbery, the officer had probable cause to believe that the watch constituted evidence of criminal activity, and its seizure was permissible under the "plain view" exception. *Id.*

Appellant correctly notes that if a police officer lacks probable cause to believe that an object in plain view is contraband "without conducting some further search of the object," "the plain-view doctrine cannot justify its seizure." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S. Ct. 2130, 2137 (1993). For example, in *Dickerson*, a police officer submitted the defendant to a "patdown search" for weapons. *Id.* at 369, 113 S. Ct. at 2133. Although the officer admitted

21

that the search revealed no weapons, he felt a "small lump" in the defendant's pocket, he "examined it with [his] fingers," and "it felt to be a lump of crack cocaine in cellophane." *Id.* The Court held that because the "incriminating nature" of the "lump" was not immediately apparent to the police officer, his "continued exploration" of the pocket constituted a further search. *Id.* at 378–79, 113 S. Ct. at 2138–39. Because this further search was not lawful as a precautionary search for weapons, the Court held that the evidence was not admissible under the "plain-view" exception as its incriminating nature became apparent only due to the second, unauthorized search. *Id.*

Appellant also relies on *Arizona v. Hicks*, 480 U.S. 321, 107 S. Ct. 1149 (1987). In *Hicks*, a bullet was fired through the floor of the defendant's apartment, and police officers entered the apartment to search for the shooter, other victims, or weapons. *Id.* at 323, 107 S. Ct. at 1152. One of the officers noticed stereo equipment that "seemed out of place" in the apartment. *Id.* Because he suspected that the equipment was stolen, the officer moved the components to reveal their serial numbers, which he then recorded. *Id.* Later, he determined that the serial numbers matched those of equipment taken in an armed robbery. *Id.* at 323–24, 107 S. Ct. at 1152. The Court held that the moving of the stereo equipment and recording of the serial numbers constituted a further search, and only through that search did the police officer have probable cause to seize the equipment. *Id.* at

22

326–27, 107 S. Ct. at 1153–54. Thus, the evidence was not "immediately apparent" as contraband to the police officer, and its seizure was not lawful under the plain-view doctrine. *Id.*

Here, Officer Garza had previously received information from Jennifer Richert that appellant "had possession of weapons and perhaps videos." Jennifer also informed Garza that appellant had told her that "if police ever came looking for him, . . . he would hide in his attic and possibly take all those items with him." Garza told the police officers on the arrest team that appellant had told Jennifer "when the police came looking for him that he was going to also hide in the attic and take anything with him that would incriminate him." When the officers arrived at the house, appellant, as Jennifer had indicated, hid in the attic for 30 to 40 minutes as the police officers waited outside. After placing appellant under arrest, Officer Haney saw a bag containing "some floppies," "some 8-millimeter tapes," and a videotape in the attic where appellant had been hiding. Moreover, Haney explained that, in his training regarding child-abuse offenders, he learned that such offenders commonly collect "souvenirs" such as "video or digital evidence of their crimes" as a "memento [so] . . . they can relive that experience." Here, unlike in *Dickinson* or *Hicks*, no further search of the evidence was required for Haney to "immediately recognize" it such that he had probable cause to believe that it constituted evidence of criminal activity.

23

Given the information provided to Officer Garza by Jennifer, appellant's actions upon the police officers' arrival at his home that corroborated her information, and Officer Haney's knowledge and experience regarding child-abuse offenders, the trial court could have reasonably concluded that Haney had probable cause to believe that the items found in appellant's attic constituted evidence of criminal activity. *See Williford v. State*, 127 S.W.3d 309, 313 (Tex. App.— Eastland 2004, pet. ref'd) (holding that seizure of defendant's computer without search warrant was lawful where computer technician informed police officer about child pornography images on computer); *cf. Gonzales v. State*, 648 S.W.2d 684, 686 (Tex. Crim. App. 1983) (stating that "objects which are not inherently suspicious can become so under certain circumstances," such as when police officer knows from experience that narcotics are "commonly packaged in a particular manner") (quoting *Sullivan v. State*, 626 S.W.2d 58, 60 (Tex. Crim. App. 1981)).

Accordingly, we hold that the search of appellant's attic and seizure of the evidence found therein did not violate the Fourth Amendment or Article I, section 9 of the Texas Constitution.

We overrule appellant's second and third issues.

24

**Attorney-Client Privilege**

In his fourth issue, appellant argues that the trial court erred in admitting into evidence the videotape depicting him and Jennifer acting out his "father/daughter fantasy" because "the State's seizure and continued possession of the videotape violated the attorney-client privilege." Appellant argues that the videotape is covered by the attorney-client privilege because the phrase "ATTORNEY/CLIENT PRIVILEGE" is written on the outside of the videotape.

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services. TEX. R. EVID. 503(b); *Austin v. State*, 934 S.W.2d 672, 673 (Tex. Crim. App. 1996). Therefore, application of the attorney–client privilege depends on whether the communication sought to be protected is "confidential." *Austin*, 934 S.W.2d at 674. A communication is "confidential" if it is not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client. *Id.* The client bears the burden of establishing the existence of the privilege. *Id.*

In support of his argument that the contents of the videotape are privileged, appellant relies on *Henderson v. State*, 962 S.W.2d 544 (Tex. Crim. App. 1997). In *Henderson,* the court held that the State could compel the defendant's attorney

to produce a map provided to the attorney by the defendant, potentially revealing the location of a child victim, because of the "strong public policy interest of protecting a child from death or serious bodily injury." *Id.* at 557. Appellant argues that there are no such considerations here because the videotape did not involve "death or serious bodily injury" and "the officers waited a significant amount of time after the seizure . . . to view its content." However, in *Henderson*, the court assumed, without deciding, that the map was "intended to be confidential" when it was made. *Id.* at 551. Here, although appellant notes that the videotape was marked, "ATTORNEY/CLIENT PRIVILEGE," he does not cite us to any evidence indicating how the videotape could possibly have actually been prepared "in furtherance of the rendition of professional legal services." *See Austin*, 932 S.W.2d at 674. Accordingly, we hold that the trial court did not err in admitting the videotape into evidence.

We overrule appellant's fourth issue.

### Relevant Evidence

In his fifth and sixth issues, appellant argues that the trial court erred in admitting into evidence Jennifer's testimony concerning appellant's "fantasies" and the videotape depicting Jennifer and appellant acting out his "father/daughter fantasy" because the evidence "was not relevant to any issue to be resolved by the jury and served no legitimate purpose other than to present character-conforming

26

evidence." *See* TEX. R. EVID. 403, 404(b). In his seventh and eighth issues, appellant argues that the trial court erred in admitting into evidence the testimony of the complainant's younger sister and appellant's former student concerning appellant's sexual abuse of them because their testimony "was used solely for impermissible conformity evidence in violation of [r]ule 404(b)" and was not relevant under rule 403.

A trial court's admission of evidence is reviewed under an abuse of discretion standard. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit or exclude evidence, we will not reverse a trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996).

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." TEX. R. EVID. 403. The opponent of the evidence must demonstrate that the negative attributes of the evidence substantially outweigh any probative value. *Montgomery*, 810 S.W.2d at 377. The relevant criteria in a rule 403 analysis include, but are not limited to, (1) the probative value of the evidence; (2) the potential to impress the jury in some

irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005); *Manning v. State*, 114 S.W.3d 922, 927 (Tex. Crim. App. 2003). Moreover, evidence of other crimes, wrongs, or acts is generally not admissible to prove the character of a person in order to show action in conformity therewith. TEX. R. EVID. 404(b). Extraneous evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.*

The State asserts that appellant "opened the door" to the testimony of the complainant's younger sister and appellant's former student. The evidence regarding the student was first raised by appellant in his opening statement, when his counsel explained,

> [I]n 2001, something horrible happened. One of Ryan's students made accusations that he had touched her inappropriately. A civil suit ensued, family sued the school district, HISD. . . . [I]n the end, the criminal charges were dismissed. Nothing came of it. . . . I think what the evidence is going to show [is] that [appellant] became a target after that.

In regard to the allegations made by the younger sister, appellant's counsel, during his opening statement, stated,

> There was a custody battle ongoing. This went on for years. And I think what the evidence is going to show you is that during this custody battle, allegations came up by his son . . . and [the complainant] that he had touched them. These allegations came through the mother, Jennifer, and her mother, Peggy Williams. CPS

28

did a full investigation. Went and immediately talked to the children. Both the children said, "Nothing happened. Dad didn't do anything to me." . . . Then in 2009, the youngest daughter . . . comes forward with allegations, again, to the grandmother, on the mother's side, "Daddy's touching me." [The complainant] was present when this outcry happens. All the children are interviewed. [The son is] interviewed. [The complainant is] interviewed also. They both say, "Nothing happened. I didn't see anything. Nothing happened to me. Not aware of anything."

"[A] defense opening statement . . . opens the door to the admission of extraneous-offense evidence . . . to rebut the theory presented in the defense opening statement." *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008). For example, in *Bass*, the defendant, who was charged with indecency with a child, argued in his opening statement that the complainant's allegations were "pure fabrication," "contrary to [his] character," and "not worthy of belief." *Id.* at 557. The State introduced testimony that the defendant had been accused of molesting two other children previously. *Id.* at 558–59. The court held that it was "subject to reasonable disagreement whether the extraneous-offense evidence was admissible for the . . . purpose of rebutting [the defendant's] defensive theory that the [complainant] fabricated her allegations against him." *Id.* at 563; *see also Blackwell v. State*, 193 S.W.3d 1, 9 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding that, in trial for indecency with child, testimony of two alleged previous complainants, although extraneous-offense evidence, was admissible to

rebut defensive theories that defendant lacked intent to have sexual contact with complainant and defendant was being framed).

Here, in his opening statement, appellant first mentioned the student's allegations in an attempt to portray them as meritless because "criminal charges were dismissed" and "[n]othing came of it." Appellant also first mentioned the allegations made by the complainant's younger sister in an attempt to portray the allegations of the son, the complainant, and her younger sister as fabricated by Jennifer and Williams for use in Jennifer and appellant's ongoing custody battle. Under these circumstances, the trial court could have reasonably concluded that evidence of the student's allegations and appellant's alleged abuse of the complainant's younger sister were admissible to rebut the defensive theory that the allegations were fabricated. *See Bass*, 270 S.W.3d at 563; *Blackwell*, 193 S.W.3d at 9. Accordingly, we hold that the trial court did not err in admitting the testimony of the complainant's younger sister or the student under rule 404(b).

In regard to the rule 403 challenge to the testimony of the complainant's younger sister and the student, appellant, at trial, objected to their testimony as inadmissible only under rule 404(b). A rule 404(b) objection does not preserve error in regard to rule 403. *See Johnson v. State*, 145 S.W.3d 215, 220 n.13 (Tex. Crim. App. 2004); TEX. R. APP. P. 33.1(a). Thus, appellant did not preserve his

rule 403 challenge for review regarding the testimony of the complainant's younger sister and the student.

We overrule appellant's seventh and eighth issues.

Appellant also argues that the videotape clip of him and Jennifer acting out his "father/daughter fantasy" as well as Jennifer's testimony regarding his "fantasies" were improperly admitted over his rule 403 and rule 404(b) objections. In regard to appellant's rule 404(b) objections, he argues that both the videotape and Jennifer's testimony regarding his fantasies "had no relevance or purpose except to show character conformity and to prejudice the jury by branding appellant as someone who looked really bad" and a "sexual deviant." However, although extraneous-offense evidence is not admissible to show conformity of character, it is admissible to prove other matters such as proof of motive. *See* TEX. R. EVID. 404(b). And extraneous-offense evidence is also admissible to rebut a defensive theory. *Bass*, 270 S.W.3d at 563. We note, again, that appellant asserted that the allegations were fabricated as part of the ongoing custody battle with Jennifer and he lacked the intent to commit the charged offense.

Here, it is undisputed that the videotape was redacted to show only appellant and Jennifer acting out his "father/daughter fantasy," wherein appellant acts as if he is sexually assaulting his daughter. Likewise, Jennifer's testimony regarding appellant's "fantasies" explained her role in the videotape, as she testified that

31

appellant would describe himself as "dominant" and Jennifer as "subservient." She explained that the "father/daughter fantasy" was appellant's "favorite" among others, and, during which, appellant would "prompt" her to act as if she was a "child . . . being raped by its father." Thus, Jennifer's testimony placed the videotape in context, and both the videotape and her testimony were admissible to rebut the defensive theory that the allegations against appellant were fabricated and to demonstrate his motive, i.e., being sexually attracted to his daughter. *See Wheeler v. State*, 67 S.W.3d 879, 887 (Tex. Crim. App. 2002) (holding that extraneous-offense evidence was admissible to rebut defendant's theory of "frame-up" because extraneous offense did not involve "money nor revenge as possible motives"); *Bargas v. State*, 252 S.W.3d 876, 891 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that extraneous-offense evidence was admissible to rebut retaliation theory); *Blackwell*, 193 S.W.3d at 13–15 (holding that because extraneous offenses were similar to charged offense, admission was probative of defendant's intent and to rebut theory that defendant was "victim of a frame-up"); *Townsend v. State*, 776 S.W.2d 316, 318 (Tex. App.—Houston [1st Dist.] 1989, pet. ref'd) ("The two extraneous offenses were admissible to controvert the false impression left by [the defendant] that he was not the type of person who would commit a sexual offense against a child, and that he was simply the innocent victim of the children's anger and their overactive imaginations.").

In support of his argument, appellant relies on *Fox v. State*, 283 S.W.3d 85 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). In *Fox*, the Fourteenth Court of Appeals held that the trial court erred in admitting evidence that the defendant would occasionally cross-dress in his trial for indecency with a child. *Id.* at 93–94. The court noted that the evidence had "no relevance beyond demonstrating that appellant occasionally dressed in women's clothing." *Id.* at 94. Here, however, the evidence regarding appellant's specific fantasy of sexually assaulting his daughter, an extraneous act similar to the charged offense, was indeed relevant in regard to the charged offense. And, as explained above, this evidence was relevant apart from character conformity in establishing appellant's motive and rebutting a defensive theory.

In regard to appellant's rule 403 objection, the first factor of admission, the strength of the extraneous offense evidence to make a fact of consequence more or less probable, weighs in favor of admission. As conceded by appellant, the videotape demonstrates appellant acting out his "father/daughter fantasy" wherein he acts as if he is sexually abusing his daughter. And Jennifer's testimony further explained the fantasy and placed her involvement in the fantasy in context of the complainant. This evidence is probative on the issues of appellant's motive and intent to commit the continuing sexual abuse. *See Blackwell*, 193 S.W.3d at 15. And the evidence also made the defensive theory that the allegations were

fabricated less probable by demonstrating that appellant had a motive for committing the offense. *See Wheeler*, 67 S.W.3d at 888; *Bargas*, 252 S.W.3d at 893.

The second rule 403 factor, the potential of the extraneous-offense evidence to impress the jury in some irrational and indelible way, weighs neither for or against admission. Some of Jennifer's testimony was graphic, as she explained how appellant would "pin[] her down" and have her pretend as if she were his daughter. And it is undisputed that the videotape, in depicting these events, was graphic as well. However, the trial court instructed the jury that "if there is any evidence before you in this case regarding the defendant's committing an alleged offense or offenses other than the offense in this case . . . you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The trial court's instructions to the jury are a factor to consider in determining whether the jury considered the extraneous-offense evidence improperly. *Blackwell*, 193 S.W.3d at 15. The State, in its closing argument, also noted that any extraneous-offense evidence could only be used "in determining if there is proof beyond a reasonable doubt for . . . the crime that [appellant] is accused of against [the complainant]." Because the jury was instructed as to how to properly consider the evidence, the

trial court mitigated the possibility that the evidence would "impress the jury in some irrational but indelible way." *See id.*

The third rule 403 factor, the time during trial that was required to develop the evidence, weighs slightly in favor of admission. While Jennifer did explain appellant's "father/daughter fantasy" in detail, a large portion of her testimony was spent explaining her reaction to the student's allegations and describing the first outcry from the complainant. Also, Jennifer's testimony was preceded by lengthy testimony from the complainant's grandparents regarding her outcry to the grandmother, the complainant's own testimony regarding the offense and her outcry, and the testimony of the complainant's younger sister and the student regarding appellant's sexual assaults of them. Finally, it is undisputed that the videotape played in front of the jury was significantly redacted, as only three minutes of the tape was played for the jury. *See Bargas*, 252 S.W.3d at 893.

The fourth and final rule 403 factor, the State's need for the extraneous evidence, also weighs in favor of admission. As explained above, appellant, in his opening statement, referred to the ongoing custody battle, the multiple allegations that CPS, according to appellant, had previously ruled out, and the amount of time between the sexual assault of complainant and her outcry as evidence that her allegations were fabricated. In his opening statement, appellant argued,

> The divorce was nasty. Or I should say it got nasty. There was a custody battle ongoing. This went on for years. And I think what the

35

evidence is going to show you is that during this custody battle, allegations came up by his son . . . and daughter . . . that he had touched them. These allegations came through the mother, Jennifer, and her mother, Peggy Williams. CPS did a full investigation. Went and immediately talked to the children. Both the children said, Nothing happened. Dad didn't do anything to me. That's the kind of divorce and custody battle this was.

During his cross-examination of Williams, appellant asked why Williams had not reported the complainant's outcry to CPS immediately instead of having her tell someone at school. He asked, "Wouldn't you agree that looks like you might be trying to set it up so that the school is the first person that's told?" And, during cross-examination of Jennifer, appellant again noted that the custody battle was "very contentious" and the divorce was "long and bitter." He also asked whether Jennifer had first mentioned "allegations of sexual assault with [her] children" in a meeting regarding the visitation schedule during the custody battle. Appellant also noted throughout his case the lack of physical evidence and the complainant's failure to tell anyone about her allegations until several years after she had claimed the abuse had occurred. Because appellant strongly contested the complainant's allegations on the theory that they were fabricated, this factor weighs in favor of admissibility. *See Bargas*, 252 S.W.3d at 893.

Thus, three of the four rule 403 factors weigh in favor of admissibility of the evidence demonstrating appellant's "fantasies," both the videotape and Jennifer's testimony. On this record, we cannot conclude that the trial court's ruling that the

evidence was more probative than prejudicial was outside the zone of reasonable disagreement.  *See Green*, 934 S.W.2d at 102.  Accordingly, we hold that the trial court did not err in admitting the evidence under rule 403.

We overrule appellant's fifth and sixth issues.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

Do not publish.  TEX. R. APP. P. 47.2(b).